35 F.3d 1148
 147 L.R.R.M. (BNA) 2257, 63 USLW 2174,
128 Lab.Cas. P 11,181
 ELECTROMATION, INCORPORATED, Petitioner-Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner,
and
Teamsters, Chauffeurs and Helpers Local Union 364 and
International Brotherhood of Teamsters,
Intervening-Respondents.
 Nos. 92-4129, 93-1169.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 27, 1993.
Decided Sept. 15, 1994.
 
 1
 Brian J. Martin, Barnes & Thornburg, Indianapolis, IN (argued), Kathleen K. Brickley, Barnes & Thornburg, South Bend, IN, for Electromation, Inc.
 
 
 2
 Aileen A. Armstrong, Linda J. Dreeben (argued), N.L.R.B. Appellate Court, Enforcement Litigation, Washington, DC, Rik Lineback and William T. Little, N.L.R.B., Indianapolis, IN, for N.L.R.B.
 
 
 3
 Gary S. Witlen, Intern. Broth. of Teamsters, Washington, DC (argued), for Teamsters, Chauffeurs and Helpers Local Union 364 and Intern. Broth. of Teamsters.
 
 
 4
 Philip A. Miscimarra, Jeffrey C. Kauffman, Stacy D. Shartin, Anthony B. Byergo, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, Jan S. Amundson, Nat. Ass'n of Mfrs., Washington, DC, for Nat. Ass'n of Mfrs., amicus curiae.
 
 
 5
 Philip A. Miscimarra, Jeffrey C. Kauffman, Stacy D. Shartin, Anthony B. Byergo, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, Stephen A. Bokat, Mona C. Zeiberg, National Chamber Litigation Center, Washington, DC, for Chamber of Commerce of U.S., amicus curiae.
 
 
 6
 Philip A. Miscimarra, Jeffrey C. Kauffman, Stacy D. Shartin, Anthony B. Byergo, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for American Iron and Steel Institute, amicus curiae and Coalition of Management for Positive Employment, Training and Educ., amicus curiae.
 
 
 7
 Robert E. Williams, Daniel V. Yager, Jeffrey C. McGuiness, McGuiness & Williams, Washington, DC, for Labor Policy Ass'n, amicus curiae American Soc. for Quality Control, amicus curiae, Development Dimensions, amicus curiae, Quality & Productivity Management Ass'n, amicus curiae, American Productivity & Quality Center, amicus curiae and Arthur D. Little, Inc., amicus curiae.
 
 
 8
 Howard Lesnick, University of Pennsylvania School of Law, Philadelphia, PA, Lewis L. Maltby, American Civil Liberties Union Foundation, New York City, for American Civil Liberties Union Foundation, amicus curiae.
 
 
 9
 Mary E. Leary, Pittsburgh, PA, Ellis Boal, Detroit, MI, for Labor Notes, amicus curiae and United Electrical, Radio and Mach. Workers of America, amicus curiae.
 
 
 10
 Laurence Gold, Washington, DC, Marsha S. Berzon, Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, CA, for American Federation of Labor and Congress of Indust. Organizations, amicus curiae.
 
 
 11
 Before CUMMINGS and FLAUM, Circuit Judges, and WILL, District Judge.*
 
 
 12
 WILL, District Judge.
 
 
 13
 In this appeal, we consider a petition to set aside and a cross-petition to enforce an order of the National Labor Relations Board (the "NLRB" or "Board"), which found that the petitioner employer, Electromation, Inc. (the "company"), violated Section 8(a)(2) and (1) of the National Labor Relations Act (the "Act") through its establishment and administration of "action committees" consisting of employees and management. Believing that this case potentially raised the rather novel and important issue whether modern "employee involvement" or "employee participation" organizations are unlawful under Section 8(a)(2) and (1) of the Act, numerous amici have filed supporting and opposing briefs in this appeal.[1] The International Brotherhood of Teamsters and Teamsters Local Union 364, as intervening respondents, also filed a brief in support of the Board. As explained below, we find it unnecessary to address this much broader issue and, for the reasons stated, simply order that the Board's order in this case be enforced.
 
 I.
 BACKGROUND
 
 14
 Electromation manufactures at its plant in Elkhart, Indiana, small electrical and electronic components and related products, such as seat belt restraint solenoids, solenoids for outboard engines and chainsaws, switches and harnesses, primarily for the automobile industry and for power equipment manufacturers. At the time of the events which gave rise to this suit, Electromation's approximately 200 employees, most of whom were women, were not represented by any labor organization. To minimize the financial losses it was experiencing at the time, the company in late 1988 decided to cut expenses by revising its employee attendance policy and replacing the 1989 scheduled wage increases with lump sum payments based on the length of each employee's service at the company. Electromation informed its employees of these changes at the 1988 employee Christmas party.
 
 
 15
 In January 1989, the company received a handwritten request signed by 68 employees expressing their dissatisfaction with and requesting reconsideration of the revised attendance bonus/wage policy. After meeting with the company's supervisors, the company President, John Howard, decided to meet directly with employees to discuss their concerns. Accordingly, on January 11, 1989, the company met with eight employees--three randomly selected high-seniority employees, three randomly selected low-seniority employees, and two additional employees who had requested that they be included--to discuss a number of matters, including wages, bonuses, incentive pay, tardiness, attendance programs, and bereavement and sick leave policy, all normal collective bargaining issues.
 
 
 16
 Following this meeting, Howard met again with the supervisors and concluded that management had "possibly made a mistake in judgment in December in deciding what we ought to do." Because Howard concluded that "it was very unlikely that further unilateral management action to resolve these problems was going to come anywhere near making everybody happy ... [and] that the better course of action would be to involve the employees in coming up with solutions to these issues," the company determined that "action committees" would be an appropriate way to involve employees in the process. Accordingly, on January 18, 1989, the company met again with the same eight employees and Howard explained that the management had distilled the employees' complaints, which had addressed approximately 20-25 areas of concern, into five categories and proposed the creation of action committees to "meet and try to come up with ways to resolve these problems; and that if they came up with solutions that ... we believed were within budget concerns and they generally felt would be acceptable to the employees, that we would implement these suggestions or proposals."
 
 
 17
 The employees at the January 18 meeting initially reacted negatively to the concept of action committees. The employees did not want more meetings or committees; rather, they wanted solutions to the numerous problems they had identified. Howard then explained to them that because "the business was in trouble financially ... we couldn't just put things back the way they were ... we don't have better ideas at this point than to sit down and work with you on them." According to Howard, as the meeting progressed, the employees "began to understand that [the action committees proposal] was far better than leaving things as they were, and we weren't going to just unilaterally make changes. And so they accepted it." At the employees' suggestion, Howard agreed that, rather than having a random selection of employee committee members, sign-up sheets for each action committee would be posted.
 
 
 18
 On the next day, the company posted a memorandum to all employees announcing the formation of the following five action committees: (1) Absenteeism/Infractions; (2) No Smoking Policy; (3) Communication Network; (4) Pay Progression for Premium Positions; and (5) Attendance Bonus Program. See Ex. GC2. Sign-up sheets were also posted at this time. See Exs. GC3A-3F. Each committee was to consist of up to six employees and one or two members of management, as well as the company's Employee Benefits Manager, Loretta Dickey, who was in charge of the coordination of all the committees. Apparently, Dickey's role was primarily to facilitate the discussions between the company and its employees. Although the sign-up sheets also stated the goals of each action committee, no employees were involved in the drafting of any aspect of the memorandum or the statement of subjects that the committees were to consider.
 
 
 19
 The company also unilaterally decided that two employees who had signed up for more than one committee would be limited to participation on only one committee. The first employee, Barb Church, signed up for four committees and was chosen for only one--the Communication Network Committee. The second employee, Gayle Barker, signed up for three committees and was chosen for only one--the Attendance Bonus Program Committee. As it turned out, there were no long waiting lines to sign up for the committees, and some who did sign up later crossed out their names.
 
 
 20
 Shortly thereafter, the company posted a memorandum announcing the members of each committee and dates of the initial committee meetings. See Ex. GC4. Six employees signed up for the Absenteeism/Infractions Committee, three signed up for the No Smoking Policy Committee, five signed up for the Pay Progression for Premium Positions Committee, five signed up for the Communication Network Committee, and six signed up for the Attendance Bonus Program Committee. Although the memorandum announcing the creation of the action committees declared that membership on each committee would be determined by the volunteer group for that committee, Dickey apparently made the final determination of which employees would participate on each committee. Five employees were eventually chosen to serve on each committee. The employees were not given an opportunity to vote on Dickey's selection of employee committee members. Each committee also included at least one supervisor or manager in addition to Dickey.
 
 
 21
 The No Smoking Policy Committee was never organized and apparently held no meetings. In late January and early February 1989, each of the other action committees began to meet. All committee meetings took place on company premises, generally on a weekly basis in a company conference room. Each committee elected a secretary to take notes. The company paid employees for their time spent in committee meetings and provided all necessary materials and supplies, such as files, pencils, paper, and telephones. According to Dickey, management expected that the employee members of the committees would "kind of talk back and forth" with the other employees in the plant because "anyone [who] wanted to know what was going on, they [could] go to these people." In order to keep other employees posted on the progress of the action committee work, at least one update memorandum was posted which described the activities of the action committees. See Ex. GC5. The update memorandum was drafted by management without consultation with the employee members of each committee.
 
 
 22
 During the Attendance Bonus Committee's first meeting, Dickey and Electromation's Controller, Dan Mazur, solicited employee ideas regarding a good employee attendance award program. Their goal was to develop an attendance program which would be both affordable to the company and satisfactory to the employees. Through the discussions, the committee developed a proposal, which was declared by Mazur to be too costly and was not pursued further for that reason. Because the first proposal had been rejected, the committee developed a second proposal, which was deemed fiscally sound by Mazur. However, due to the intervening demand for union recognition, the second proposal was never presented to Howard and no responsive action by the company was ever taken.
 
 
 23
 On February 13, 1989, the International Brotherhood of Teamsters, Local Union No. 1049 (the "union") demanded recognition from the company. Until then, the company was unaware that any organizing efforts had occurred at the plant. In late February, Howard informed Dickey of the union's demand for recognition. Upon the advice of counsel, Dickey announced at the next meeting of each committee that, due to the union demand, the company could no longer participate in the committees, but that the employee members could continue to meet if they so desired.
 
 
 24
 The Absenteeism/Infraction and the Communication Network Committees continued to meet. The Pay Progression Committee disbanded. The Attendance Bonus Committee decided to write up its second proposal and then to disband. Finally, on March 15, 1989, Howard formally announced to the employees that "due to the Union's campaign, the Company would be unable to participate in the [committee] meetings and could not continue to work with the committees until after the [union] election." The union election took place on March 31, 1989; the employees voted 95 to 82 against union representation. On April 24, 1989, a regional director of the Board issued a complaint alleging that Electromation had violated the Act.
 
 
 25
 As they are described above, the facts in this case are largely undisputed. On this evidence, the ALJ concluded that the Electromation action committees constituted labor organizations within the meaning of Section 2(5) of the Act. He noted that employees, supervisors, and managerial personnel served as committee members and that their discussions concerned conditions of employment. Because he found that the company had organized the committees, created their nature and structure, and determined their functions, the ALJ further held that the company had dominated and assisted the committees in violation of Section 8(a)(2). In support of this determination, the ALJ observed that, although management did not dominate the discussions, the committee meetings occurred on company property, the supplies and materials were provided by management, and the employee members were paid for their time spent on committee work. The ALJ found no merit to the allegations that the company had threatened and interrogated employees in violation of Section 8(a)(1).
 
 
 26
 The company appealed this decision to the Board, which scheduled oral argument because the case raised important Section 8(a)(2) and (1) issues. In its exceptions and brief, the company contended that the action committees were not labor organizations within the meaning of the Act and that they did not interfere with employee free choice. The company argued that no proposal from any action committee was ever implemented, that the committees were formed in the absence of any company knowledge of union activity, and that the committees followed a company tradition of employer-employee meetings.
 
 
 27
 The Board issued its final Decision and Order on December 17, 1992. See Electromation, Inc., 309 N.L.R.B. 990 (1992). The Board also found that the action committees constituted labor organizations within the meaning of Section 2(5) of the Act, and that the company had dominated and assisted them within the meaning of Section 8(a)(2) and (1). Specifically, the Board determined that the only purpose of the committees, which were created in direct response to employee disaffection concerning changes in conditions of employment, was to deal with those conditions through a bilateral process involving both employees and management in an attempt to reach bilateral solutions on the basis of employee-initiated proposals. Id. at 997.
 
 
 28
 The Board also concluded that the employee committee members acted in a representational capacity within the meaning of the Act. Id. Noting that (1) the employer initiated the idea to create the committees, (2) the employer unilaterally drafted the written purposes and goals statements of the committees, (3) the employer unilaterally determined how many members would compose each committee and that an employee could serve on only one committee at a time, and (4) the employer appointed management representatives to the committees to facilitate the discussions, the Board found that the company had violated Section 8(a)(2) and (1) of the Act by dominating the formation and administration of, and contributing financial and other support to, the action committees. Id. at 998. In support of its findings, the Board also noted that the employer permitted the employees to conduct committee activities on paid time within a structure wholly designed by the employer.
 
 
 29
 The Board concluded on this evidence that the committees were the creation of the employer and that the impetus for their continued existence rested solely with Electromation. The Board agreed with the ALJ that the company did not effectively disestablish the committees upon receipt of the union's bargaining demand. Id. The Board found that the purpose of the action committees was not to enable management and employees to cooperate to improve quality or efficiency, but rather to create in employees the impression that their disagreements with management had been resolved bilaterally, where in fact the employer had imposed on its employees a unilateral form of bargaining in violation of Sections 8(a)(2) and (1). Id. Chairman Stephens and Members Devaney and Oviatt joined in the Board's majority opinion. Member Raudabaugh also concurred in the finding of a violation of Section 8(a)(2) with a somewhat different analysis.
 
 
 30
 Member Devaney also wrote a concurring opinion to point out that the action committees at issue did not constitute a genuine employee participation program, and that, despite the holding in this case, legislative history, judicial precedent, and Board precedent provide significant latitude to employers seeking to involve employees in the workplace. Id. at 999. He concluded that Section 8(a)(2) does not create obstacles for employers wishing to implement legitimate employee involvement programs, as long as those programs do not impair the right of employees to their free choice of a bargaining representative. Id. Member Devaney emphasized that the employer's establishment of the committees in this case was illegal domination and support of a labor organization in violation of Section 8(a)(2) primarily because these committees placed the employer on both sides of the bargaining table to discuss the terms and conditions of employment, thus giving employees the illusion of a bargaining representative without the reality of one. Id. at 1003.
 
 
 31
 Member Oviatt noted in his concurrence that the critical question under Section 8(a)(2) is whether the entity is created with any purpose to deal with grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work, as set forth in the Section 2(5) definition of labor organization. Id. at 1004. Because the action committees' purpose was to address and find solutions for issues related to absenteeism, pay progression, attendance bonuses, and no smoking policies, he found a clear violation of Section 8(a)(2). Recognizing the critical importance of the ability of management and employees to engage in cooperative endeavors to improve production methods and product quality, he emphasized that the Board's decision should not be read as a condemnation of employee/management cooperative programs and other employee participation committees, which are permissible under Section 8(a)(2). Id. at 1004-5.
 
 
 32
 Member Raudabaugh wrote a concurrence in which he agreed with the majority's conclusion that the company had violated Section 8(a)(2) of the Act, but disagreed with the analysis. In his concurrence, he specifically addressed the broader issue whether Section 8(a)(2) should be reinterpreted in light of the growing national importance of employee participation programs. He first agreed with the majority that, in light of clear Supreme Court precedent, the action committees are labor organizations within the meaning of Section 2(5). After an extensive discussion of the legislative history of Section 8(a)(2), including the impact of the passage of the Taft-Hartley Act of 1947, id. at 1006-12, he concluded that existing Supreme Court precedent does not foreclose a fresh interpretation of Section 8(a)(2) and further suggested that the legality of employee participation programs under that section should turn on consideration of the following factors, no one of which would be dispositive in any given case: (1) the extent of the employer's involvement in the structure and operation of the committees; (2) whether the employees, from an objective standpoint, reasonably perceive the employee participation program as a substitute for full collective bargaining through a traditional union; (3) whether employees have been assured of their Section 7 right to choose to be represented by a traditional union under a system of full collective bargaining; and (4) the employer's motives in establishing the employee participation program. Applying these four factors to this case, he found that the employer's conduct in establishing the action committees was violative of Section 8(a)(2). Id. at 1013. In reaching his conclusion, Member Raudabaugh observed that the employer completely dictated the structure and operation of the committees as a mechanism to respond to employee grievances and that the employee committee members were reasonably perceived as representatives by their fellow employees.
 
 
 33
 The Board's order requires the company to: (1) cease and desist from dominating, assisting, or otherwise supporting the action committees and in any like manner interfering with, restraining, or coercing employees in the exercise of their Section 7 rights; (2) disestablish the action committees; and (3) post an appropriate notice. Id. at 998. Electromation has filed a petition to set aside this order. The Board and union have cross-petitioned for enforcement of the order.
 
 II.
 STANDARD OF REVIEW
 
 34
 We have jurisdiction to consider the parties' petitions under 29 U.S.C. Sec. 160(e) and (f). Central Transport Inc. v. NLRB, 997 F.2d 1180, 1184 (7th Cir.1993); NLRB v. Joe B. Foods, Inc., 953 F.2d 287, 291 (7th Cir.1992). However, our role in reviewing Board decisions is sharply limited. We must uphold the Board's determinations if its factual findings are supported by substantial evidence and its legal conclusions have a reasonable basis in the law. NLRB v. Augusta Bakery Corp., 957 F.2d 1467, 1471 (7th Cir.1992).
 
 
 35
 The Board's findings of fact are conclusive if they are supported by substantial evidence on the record as a whole, even if this Court would have reached different conclusions had the matter been before it de novo. NLRB v. Shelby Memorial Hosp. Ass'n, 1 F.3d 550, 554 (7th Cir.1993); Livingston Pipe & Tube, Inc. v. NLRB, 987 F.2d 422, 426 (7th Cir.1993). See also United States Marine Corp. v. NLRB, 944 F.2d 1305, 1313-14 (7th Cir.1991) (en banc), cert. denied, --- U.S. ----, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992). Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support the Board's determination. Roadmaster Corp. v. NLRB, 874 F.2d 448, 452 (7th Cir.1989) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 488, 71 S.Ct. 456, 459, 465, 95 L.Ed. 456 (1951)).
 
 
 36
 We must also consider whether the Board's construction of the Act is reasonable in light of its language and purposes, as determined by controlling decisions of the Supreme Court. Local 1384, United Auto., Aerospace and Agric. Implement Workers of America, UAW v. NLRB, 756 F.2d 482, 492 (7th Cir.1985) (appellate court's enforcement of Board decision "reflects only a determination by the court of appeals that the rule is rational and consistent with the Act, not that it is the uniquely correct rule"); International Ass'n of Bridge, Structural, and Ornamental Ironworkers, AFL-CIO, Local No. 111 v. NLRB, 946 F.2d 1264, 1267 (7th Cir.1991) (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)) (where Board's interpretation of the Act is not "precluded by statutory language or clear congressional intent, we must honor it if not 'arbitrary, capricious, or manifestly contrary to the statute' "). See also Shelby Memorial Hosp., 1 F.3d at 554 (citation omitted) ("we must uphold the Board's legal conclusions unless they are irrational or inconsistent with the National Labor Relations Act.").
 
 
 37
 In reaching our determination in this case, we recall the Supreme Court's observation in Beth Israel Hospital v. NLRB, 437 U.S. 483, 500-01, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978) (citation omitted): "[i]t is the Board on which Congress conferred the authority to develop and apply fundamental national labor policy.... 'The function of striking [the balance between conflicting legitimate interests] to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.' " See also Local No. 111, 946 F.2d at 1267 (citing NLRB v. Manitowoc Eng'g Co., 909 F.2d 963, 971 n. 10 (7th Cir.1990), cert. denied, 498 U.S. 1083, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991)) ("[o]ur standard of review is deferential in recognition of Congress' delegation to the NLRB of primary responsibility for national labor policy").
 
 III.
 DISCUSSION
 
 38
 As several amici have pointed out, in an effort to succeed in an increasingly competitive global marketplace, many United States companies have developed employee involvement structures which encourage employee participation in the design of workplace policies and procedures to improve the efficiency and effectiveness of the corporate organization and to create a workplace environment which is satisfactory to employees. See, e.g., Br. Amici Curiae of Labor Policy Association, American Society for Quality Control, Development Dimensions, Quality & Productivity Management Association, American Productivity & Quality Center, and Arthur D. Little, Inc. at 2 ("Br. Amici Curiae of Labor Policy Association"); Br. Amici Curiae of National Association of Manufacturers, Chamber of Commerce of the United States of America, American Iron and Steel Institute, and Coalition of Management for Positive Employment, Training and Education at 1-2 ("Br. Amici Curiae of National Association of Manufacturers"). See also Note, Labor-Management Cooperation After Electromation: Implications for Workplace Diversity, 107 Harv.L.Rev. 678, 678-84 (1994); Paul Weiler & Guy Mundlak, Symposium: Economic Competitiveness and the Law: New Directions for the Law of the Workplace, 102 Yale L.J. 1907 (1993). These employee participation programs are premised on management's recognition that employees are capable of contributing far more to their companies than the mere performance of tasks assigned to them by the management.
 
 
 39
 We recognize the growing importance of such employee involvement organizations. In fact, we applaud the application of such employee participation structures in appropriate situations. Because the Board found no basis to conclude that the purposes of the action committees were limited to achieving increased productivity, quality, or efficiency, or that they were designed to function solely as communication devices to promote generally the interests of quality or efficiency, it did not reach the question of whether employer-initiated programs that exist for such purposes, as described by amici, may constitute labor organizations which violate Section 8(a)(2) and (1). 309 N.L.R.B. at 997 n. 28.
 
 
 40
 In its amicus brief, the Labor Policy Association faults the Board for issuing a limited decision rather than considering the broader issue of the applicability of Section 8(a)(2) and (1) to the so-called employee incentive or representation structures, based on the changing industrial realities of an increasingly global economy. In view of the wide variety of programs presented and described in the various amicus briefs filed before the Board and this Court, the Board reasonably and properly declined to attempt to issue an opinion addressing all possible employee involvement programs. Rather, exercising its discretion to construe the Act in light of the legislative history, applicable Supreme Court precedent, and the underlying policies of the Act, the Board found that the company's actions here fell within the statutory proscriptions and did not implicate changing industrial realities that might be relevant to construction of the statute in other circumstances.
 
 
 41
 The Board did not, as certain amici argue, refuse to take into account changing industrial realities because it applied a particular construction of the Act to the facts here as dictated by legislative history and Supreme Court precedent. Instead, it simply observed that it does not have latitude to change a particular construction of the statute based on changing industrial realities where congressional intent to the contrary is absolutely clear, or where the Supreme Court has decreed that a particular reading of the statute is required, or both. Nor was it necessary to do so in this case.
 
 
 42
 There are some serious policy arguments that suggest that today's evolving industrial environment may require reconsideration of Section 8(a)(2) of the Act, or at least its interpretation and application to certain modern employee organizations. However, this case fails to provide the proper forum for such re-analysis and re-interpretation. In any event, any substantial changes should more properly be considered by Congress. See, e.g., H.R. 1529 (Representative Steven Gunderson, R-WI) ("Teamwork for Employees and Management Act," a bill to amend the Act to allow labor management cooperative efforts that improve economic competitiveness in the United States to continue to thrive, and for other purposes) and S. 669 (Senator Nancy Kassenbaum, R-KS) (same), 103d Cong., 1st Sess. (1993). Given the facts of the case before us, it would be inappropriate to address the applicability of Section 8(a)(2) to some of the quite different employee organizations described in the various amicus briefs. We emphasize that our reasoning and ruling in this case is limited to the action committees which are at issue here. It is clear that a finding of a Section 8(a)(2) and (1) violation in this case does not foreclose the lawful use of legitimate employee participation organizations, especially those which are independent, which do not function in a representational capacity, and which focus solely on increasing company productivity, efficiency, and quality control, in appropriate settings. We agree with amici that the loss of these programs would not only be injurious to United States companies' ability to compete globally, but also that it would deprive employees of valuable mechanisms by which they can assist in the formation of a healthy and productive work environment. It is clear that today, in many cases, the interests of the employer and employee are not mutually exclusive. Having identified the narrow scope of our decision, we move on to consider the Electromation action committees.
 
 
 43
 An allegation that Electromation has violated Section 8(a)(2) and (1) of the Act raises two distinct issues: first, whether the action committees in this case constituted "labor organizations" within the meaning of Section 2(5); and second, whether the employer dominated, influenced, or interfered with the formation or administration of the organization or contributed financial or other support to it, in violation of Section 8(a)(2) and (1) of the Act. Each issue will be examined in turn.
 
 
 44
 A. The Action Committees Constituted Labor Organizations
 
 
 45
 Section 2(5) of the Act defines a labor organization as:
 
 
 46
 any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.
 
 
 47
 29 U.S.C. Sec. 152(5). Under this statutory definition, the action committees would constitute labor organizations if: (1) the Electromation employees participated in the committees; (2) the committees existed, at least in part, for the purpose of "dealing with" the employer; and (3) these dealings concerned "grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."
 
 
 48
 In reaching its decision in this case, the Board also noted that "if the organization has as a purpose the representation of employees, it meets the statutory definition of 'employee representation committee or plan' under Section 2(5) and will constitute a labor organization if it also meets the criteria of employee participation and dealing with conditions of work or other statutory subjects." 309 N.L.R.B. at 994 (footnote omitted). Because the Board found that the employee members of the action committees had acted in a representational capacity, it did not decide whether an employee group could ever be found to constitute a labor organization in the absence of a finding that it acted as a representative of the other employees. Although concurring Member Devaney concluded that such a finding would be essential to a determination that a group is a labor organization within the meaning of Section 2(5), see 309 N.L.R.B. at 999-1003, we need not reach this issue.
 
 
 49
 With respect to the first factor, there is no question that the Electromation employees participated in the action committees. Turning to the second factor, which is the most seriously contested on appeal, the Board found that the activities of the action committees constituted "dealing with" the employer. In this appeal, the company primarily argues that the Board erred in finding that Section 8(a)(2) was violated. However, as an alternative ground for setting aside part of the Board's order, the company contends that there is not substantial evidence to support the finding that at least three of the action committees--the Absenteeism/Infractions Committee, the Communication Network Committee, and the Pay Progression for Premium Positions Committee--existed for the purpose of "dealing with" Electromation. Interestingly, the company concedes on appeal that there is enough evidence to support a finding that the fourth committee--the Attendance Bonus Program Committee--existed for the purpose of dealing with the company. Br. of Petitioner at 42 n. 18. The company argues that the other three action committees existed only as simple communication devices not engaged in collective bargaining of any sort, so they are not labor organizations under the statutory definition.
 
 
 50
 Although the company admits that one action committee constituted a labor organization, it argues that each committee must be considered separately under Section 2(5). Given the facts surrounding the formation and administration of all the action committees in this case, we cannot treat each committee separately. First, in their formation and administration, the individual committees were constituted as part of a single entity or program. They were initially conceived as an integrated employer response to deal with growing employee dissatisfaction. It was not until later that individual committee subject areas were identified and categorized by management. Also, a single management representative, Loretta Dickey, was assigned the responsibility for coordinating all action committee activities. The interrelatedness of these committees is further demonstrated by the company's determination that an employee could serve on only one committee at a time.
 
 
 51
 The company in fact posted only a single announcement identifying the members of each committee. Without consulting each committee individually, Dickey drafted a single statement summarizing the contemplated activities of all the committees. We agree with the Board that the action committees can be differentiated only in the specific subject matter with which each dealt. Each committee had an identical relationship to the company: the purpose, structure, and administration of each committee was essentially the same.
 
 
 52
 We note, in addition, that even if the committees are considered individually, there exists substantial evidence that each was formed and existed for the purpose of "dealing with" the company. It is in fact the shared similarities among the committee structures which compels unitary treatment of them for the purposes of the issues raised in this appeal.
 
 
 53
 The company argues in favor of a narrow construction of "labor organization" under the Act. However, as the Board noted, Congress phrased the statutory definition of labor organizations "very broadly." See S.Rep. No. 573, 74th Cong., 1st Sess. 7 (1935), reprinted in 2 NLRB, Legislative History of the National Labor Relations Act, 1935 at 2306 (1959, reprinted 1985) (hereinafter "NLRA Leg. Hist."). This Court has interpreted this definition very broadly as well. For example, relying on congressional intent, we have previously held that a labor organization need not have officers, a constitution, bylaws, dues, or a treasury in order to fit the statutory definition. Pacemaker Corp. v. NLRB, 260 F.2d 880, 883 (7th Cir.1958) ("The fact that there were no formal organization, by-laws, officers or dues is immaterial in determining whether it is a labor organization."); Indiana Metal Prod. Corp. v. NLRB, 202 F.2d 613, 620-21 (7th Cir.1953) (fact that employee committee had no formal organization does not prevent it from falling under the definition of labor organization).
 
 
 54
 We have previously noted that the broad construction of labor organization applies not only with regard to the "absence of formal organization, [but also to] the type of interchange between parties which may be deemed 'dealing' " with employers. NLRB v. Ampex Corp., 442 F.2d 82, 84 (7th Cir.), cert. denied, 404 U.S. 939, 92 S.Ct. 274, 30 L.Ed.2d 252 (1971). Moreover, an organization may satisfy the statutory requirement that it exist for the purpose in whole or in part of dealing with employers even if it has not engaged in actual bargaining or concluded a bargaining agreement. NLRB v. Cabot Carbon Co., 360 U.S. 203, 210-14, 79 S.Ct. 1015, 1020-22, 3 L.Ed.2d 1175 (1959).
 
 
 55
 In Cabot Carbon, the Supreme Court expressly rejected the contention that "dealing with" means "bargaining with," noting that Congress had declined to accept a proposal to substitute the phrase "bargaining with" for "dealing with" under Section 2(5). In that case, the Court of Appeals had found that the employee committees at issue were not labor organizations within the meaning of Section 2(5) because (1) the term "dealing with" meant "bargaining with" and the committees avoided the usual concept of collective bargaining and (2) the provisions and legislative history of the 1947 amendment of Section 9(a) of the Act demonstrated that Congress excluded such employee committees from the definition of labor organization contained in Section 2(5). The Supreme Court disagreed.
 
 
 56
 First, the Court found that nothing in the plain words of Section 2(5), its legislative history, or the decisions construing it, supported the contention that an employee committee which does not "bargain with" employers in the usual concept of collective bargaining does not engage in "dealing with" employers and, therefore, is not a labor organization. Id. at 210, 79 S.Ct. at 1020. It noted that the legislative history of Section 2(5) "strongly confirms that Congress did not understand or intend those terms to be synonymous." Id. at 211, 79 S.Ct. at 1020-21. The Court explained that when the original print of the Wagner bill--S. 1958--was being considered in the Senate, the then Secretary of Labor proposed an amendment to Section 2(5), which sought to substitute the term "bargaining collectively" for "dealing." See Hearings on S. 1958 before Sen.Comm. on Educ. and Labor, 74th Cong., 1st Sess. 66-67, reprinted in 1 NLRA Leg. Hist. at 1442-43. This proposal was not adopted. See S. 1958 (2d print), 74th Cong., 1st Sess. 4, reprinted in 2 NLRA Leg. Hist. at 2287. According to the Cabot Carbon Court, by adopting the broader term "dealing with" and rejecting the more limited term "bargaining collectively," Congress clearly did not intend that the broad term "dealing with" should be limited to and mean only "bargaining with." 360 U.S. at 211-12, 79 S.Ct. at 1021.
 
 
 57
 The Court further noted that, with full knowledge of the terms of Section 2(5) of the Wagner Act, as well as its legislative history and judicial construction, Congress in the 1947 Taft-Hartley Act re-enacted Section 2(5) without change. The Court observed that several courts of appeals, including the Seventh Circuit, had uniformly held that employee committees or plans similar to those at issue in Cabot Carbon were labor organizations. Id. at 212, 79 S.Ct. at 1021 (citing Pacemaker Corp., 260 F.2d at 883; Indiana Metal Products, 202 F.2d at 621; Harrison Sheet Steel Co. v. NLRB, 194 F.2d 407, 410 (7th Cir.1952)). Because the employee committees "made proposals and requests respecting such matters as seniority, job classification, job bidding, working schedules, holidays, vacations, sick leave, a merit system, wage corrections, and improvement of working facilities and conditions," the Court concluded that they existed for the purpose of "dealing with" the employer. Id. at 213, 79 S.Ct. at 1022.
 
 
 58
 In Cabot Carbon, the Supreme Court also considered whether Congress by its 1947 amendment of Section 9(a) eliminated employee participation committees from the term "labor organization" as defined in Section 2(5) and used in Section 8(a)(2). In concluding that it did not, the Court rejected the argument that Congress intended by its amendment to Section 9(a), which provided in pertinent part that "any individual employee or a group of employees shall have the right at any time to present grievances to their employer," H.R. 3020, as amended by the Senate, 80th Cong., 1st Sess. 86, reprinted in 1 NLRB, Legislative History of the Labor Management Relations Act, 1947 at 244 (1959, reprinted 1985) (hereinafter "LMRA Leg. Hist."), to approve inferentially what was expressly rejected by the House. The proposed new section, to be designated Section 8(d)(3), if adopted, would have permitted an employer to form or maintain "a committee of employees and discuss[ ] with it matters of mutual interest, including grievances, wages, hours of employment, and other working conditions, if the Board has not certified or if the employer has not recognized a representative as their representative under section 9." H.R. 3020, as passed by the House, 80th Cong., 1st Sess. 26, reprinted in 1 LMRA Leg. Hist. at 183. Such an argument, the Supreme Court noted, overlooks the facts (1) that the House Conference Report specifically declared that "[t]he conference agreement does not make any change" in the definition of "labor organization," H.R.Conf.Rep. No. 510, on H.R. 3020, 80th Cong., 1st Sess. 33, reprinted in 1 LMRA Leg. Hist. at 537, U.S.Code Cong.Serv. 1947, p. 1135, 1139 and (2) that the conferees specifically rejected all attempts to "amend[ ] the provisions in subsection 8(2) relating to company-dominated unions ..." and had left its prohibitions "unchanged," 93 Cong.Rec. 6600, reprinted in 2 LMRA Leg. Hist. at 1539. See 360 U.S. at 217, 79 S.Ct. at 1024.
 
 
 59
 The Supreme Court in Cabot Carbon clearly held that the later amendment of Section 9(a) provided only that any individual employee or group of employees should have the right personally to present their own grievances to their employer, and to have such grievances adjusted, without the intervention of any bargaining representative, as long as the adjustment was not inconsistent with the terms of any collective bargaining contract then in effect, and the bargaining representative, if there was one, was given the opportunity to be present. Id. at 218, 79 S.Ct. at 1024. The 1947 passage of the Taft-Hartley Act, which became the Labor Management Relations Act, thus failed to change the meaning of "labor organization" under Sections 2(5) and 8(a)(2) of the Act.
 
 
 60
 Relying in large part on these principles, the Board here explained that "dealing with" is a bilateral mechanism involving proposals from the employee organization concerning the subjects listed in Section 2(5), coupled with real or apparent consideration of those proposals by management. 309 N.L.R.B. at 995 n. 21, 997-98. While the Board further suggested that unilateral mechanisms such as suggestion boxes, brainstorming conferences, and other information exchanges do not constitute dealing, it is not necessary for us to reach that question.
 
 
 61
 Given the Supreme Court's holding in Cabot Carbon that "dealing with" includes conduct much broader than collective bargaining, the Board did not err in determining that the Electromation action committees constituted labor organizations within the meaning of Sections 2(5) and 8(a)(2) of the Act. Although it is true that Howard made no guarantees as to the results regarding the employee recommendations, the activities of the action committees nonetheless constituted "dealing with" the employer. Finally, with respect to the third factor, the subject matter of that dealing--for example, the treatment of employee absenteeism and employee bonuses--obviously concerned conditions of employment. We further agree with the Board that the purpose of the action committees was not limited to the improvement of company efficiency or product quality, but rather that they were designed to function and in fact functioned in an essentially representative capacity. Accordingly, given the statute's traditionally broad construction, there is substantial evidence to support the Board's finding that the action committees constituted labor organizations.
 
 
 62
 In his concurrence, Member Raudabaugh states that "most EPPs [employee participation plans] would fit within the broad Cabot Carbon standard of 'dealing with' ". 309 N.L.R.B. at 1008. Certain amici have made similar statements in their briefs on appeal. See, e.g., Br. Amici Curiae of Labor Policy Association at 3-4; Br. Amici Curiae of National Association of Manufacturers at 2. We do not address this question. As noted above, we believe that the determination of what is a labor organization under the Act is a factual one to be made in consideration of the specific facts surrounding the formation, function, and administration of each employee involvement or participation organization. Here, the facts clearly warrant the Board's conclusion.
 
 
 63
 B. The Company Violated Section 8(a)(2) and (1) of the Act
 
 
 64
 Having concluded that each of the action committees constituted a labor organization under Section 2(5) of the Act, we must next consider whether, through their creation and administration of the action committees, the company acted unlawfully in violation of Section 8(a)(2) and (1) of the Act.
 
 
 65
 Section 8(a)(2) declares that it shall be an unfair labor practice for an employer:
 
 
 66
 to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the Board pursuant to [Section 6], an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay.
 
 
 67
 29 U.S.C. Sec. 158(a)(2). Section 8(a)(1) provides that it shall be an unfair labor practice for an employer:
 
 
 68
 to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 157 of this title.
 
 
 69
 29 U.S.C. Sec. 158(a)(1). Section 7 in turn provides that:
 
 
 70
 [e]mployees shall have the right to self-organization, to form, to join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any and all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.
 
 
 71
 29 U.S.C. Sec. 157.
 
 
 72
 Electromation argues that the Board wrongly interpreted Section 8(a)(2) solely from the perspective of an employer's conduct and incorrectly attempted to develop an objective list of employer actions which constitute illegal domination or interference under the Act. According to the company, the Board's ruling in this case implies that an employer violates Section 8(a)(2) whenever it proposes a structure whereby the employees and employer "cooperate," or meet together to discuss topics of mutual concern. Electromation observes that Congress enacted Section 8(a)(2) primarily to ensure that employees remain free to decide for themselves how to deal with their employer, and reasons that the proper focus of that section should therefore be the subjective will of the employees against their preference. The company thus asserts that the Board may find a violation of Section 8(a)(2) only where it finds that the employer has actually undermined the free and independent choice of the employees. To support its contention that the Board incorrectly interpreted and applied Section 8(a)(2), the company addresses statutory construction, legislative history, legislative policy, and judicial precedent.
 
 1. Statutory Construction
 
 73
 Both sides concede that the analysis of Section 8(a)(2) cannot be limited to the statutory language since its terms are not all self-defining. However, the company argues that the statutory language of Section 8(a)(2) supports its contention that the proper focus of the Board's inquiry should be the subjective will of the employees.
 
 
 74
 As noted above, the statute declares it an unlawful labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it...." 29 U.S.C. Sec. 158(a)(2). The proviso to this section adds that "an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay." Id.
 
 
 75
 Relying especially on the proviso, the company argues that, in adopting Section 8(a)(2), Congress plainly did not mean to prohibit all contacts or cooperation between employers and employees. Without a doubt, this is true. However, the Board's determination neither disputes nor rejects this principle. Rather, the Board found that the activities of the company in this case constituted more than mere cooperation. See 309 N.L.R.B. at 997-98 ("There can be no doubt that the Respondent's conduct vis a vis the Action Committees constituted 'domination' in their formation and administration.... [The] employees essentially were presented with the Hobson's choice of accepting the status quo, which they disliked, or undertaking a bilateral 'exchange of ideas' within the framework of the Action Committees, as presented by the Respondent.").
 
 
 76
 The company also suggests that the words "dominate" and "interfere with" in Section 8(a)(2) are relational terms, which require consideration of both the subject and the object for their complete meaning. In other words, you cannot find that X dominates Y simply by looking at the actions of X; to so find, you must evaluate X's conduct and its effect upon Y's rights and wishes. Under this theory, the same conduct of X, if viewed from an objective standpoint, can be construed as either illegal domination or lawful cooperation, depending entirely upon what Y's rights and wishes are.
 
 
 77
 We agree with Electromation that the relevant terms in Section 8(a)(2) are relational, but disagree that the Board failed to comprehend this principle in its interpretation of that section's language. Indeed, the Board focused its analysis on the relationship between Electromation's actions in creating and administering the action committees and the resulting effect upon its employees' rights under the Act. The Board did not, as the company suggests, base its decision solely on "a list of objective practices ... that are per se unlawful." Br. of Petitioner at 29.
 
 
 78
 Nowhere in the Board's decision can we find evidence that the company's objective acts were considered outside of the context of the employees' rights and wishes. The Board in fact considered the totality of the employer's conduct in finding company domination of the action committees. The Board correctly focused on management's participation in the action committees and its effect on the employees and found domination in that the company defined the committee structures and committee subject matters, appointed a manager to coordinate and monitor the committee meetings, structured each committee to include one or two management representatives, and permitted those managers to review and reject committee proposals before they could be presented to upper level management. The Board's interpretation of Section 8(a)(2) simply does not contravene the statutory language.[2]
 
 2. Legislative History
 
 79
 Electromation next argues that the legislative history supports its interpretation of Section 8(a)(2). It essentially argues that, in drafting Section 8(a)(2), Congress mandated that the proper focus of inquiry should be on the subjective wishes of the employees rather than the conduct of the employer. Electromation cites numerous passages from the hearings that took place before the passage of the Wagner Act. For example, it notes that the Senate Report accompanying the bill that eventually became the Wagner Act explained that Congress should not:
 
 
 80
 forbid employers to engage in the normal relations and innocent communications which are part of all friendly relations between employer and employee. The policy of the Government is founded upon the theory of democratic collective bargaining, not upon the theory of class war, a concept foreign to industrial conditions in this country. And democratic collective bargaining means the exchange of ideas no less than the exchange of services, goods, or money. The object of [Section 8(a)(2) ] is to remove from the industrial scene unfair pressure, not fair discussion.
 
 
 81
 S.Rep. No. 1184, on S. 2926, 79th Cong., 2d Sess. 5 (1934), reprinted in 1 NLRA Leg.Hist. at 1104 (emphasis supplied). Also, Senator Wagner made the following comments on the bill:
 
 
 82
 Nothing in the bill prevents employers from maintaining free and direct relations with their workers.... The only prohibition is against the sham or dummy union which is dominated by the employer, which is supported by the employer, which cannot change its rules or regulations without his consent, and which cannot live except by the grace of the employer's whims. To say that that kind of a union must be preserved in order to give employees freedom of selection is a contradiction in terms. There can be no freedom in an atmosphere of bondage. No organization can be free to represent the workers when it is the mere creature of the employer.
 
 
 83
 79 Cong.Rec. 2368, 2371-72 (1935), reprinted in 1 NLRA Leg.Hist. at 1313 (emphasis supplied). The Senate Report accompanying the Wagner Act further emphasized that Section 8(a)(2):
 
 
 84
 does nothing to outlaw the free and independent organizations of workers who by their own choice limit their cooperative activities to the limits of one company. Nor does anything in the bill interfere with the freedom of the employees to establish pension benefits, outing clubs, recreational societies, and the like, so long as such organizations do not extend their functions to the field of collective bargaining, and so long as they are not used as a covert means of discriminating against or in favor of membership in any labor organization.
 
 
 85
 S.Rep. No. 573, on S. 1958, 74th Cong., 1st Sess. 10, reprinted in 2 NLRA Leg.Hist. at 2309 (emphasis supplied). Based primarily on this legislative commentary, the company argues that Section 8(a)(2) uses the words "dominate" and "interfere" to connote actions which "overrid[e] the will of the employees." Id. at 2310.
 
 
 86
 The Board found that the legislative history, including the passages quoted above, supports its interpretation and application of Section 8(a)(2) to the facts of this case. We agree. While it is true that the thrust of Section 8(a)(2) is designed to protect the free will of the employees, the legislative history reveals that the coverage of that section is broad indeed. As Senator Wagner emphasized throughout the Senate's deliberations on the Act, "[c]ollective bargaining becomes a sham when the employer sits on both sides of the table or pulls the strings behind the spokesman of those with whom he is dealing." Hearings on S. 1958 before Sen.Comm. on Educ. and Labor, 74th Cong., 1st Sess. 40-41 (1935), reprinted in 1 NLRA Leg.Hist. at 1416-17.
 
 
 87
 Moreover, the legislative history reflects that Congress was well aware of both the usefulness and the popularity of employee committees at the time that it drafted the provisions of the Wagner Act. Before enacting the Wagner Act, Congress heard extensive testimony from employees who expressed great satisfaction with their employee representation plans and committees. See, e.g., Hearings on S. 1958 before the Sen.Comm. on Educ. and Labor, 74th Cong., 1st Sess. 405-10, 414-20, 425-34, reprinted in 2 NLRA Leg.Hist. at 1791-96 (statement of Albert Crew, Representative of Employees of Bethlehem Steel Co. Plan of Employees' Representation, at Maryland Plant of Bethlehem Steel Co., Sparrows Point, MD), 1800-06 (statement of Guy E. Mitchell, Employees' Representative, Steubensville, Ohio), 1811-20 (statement of Robert F. Colley, Executive Chairman of Employee Representatives of the Butler, PA Works of the American Rolling Mill Co.).
 
 
 88
 Congress nonetheless enacted a broad proscription of employer conduct in Section 8(a)(2). Addressing the type of conduct proscribed by this section, the Report of the Senate Committee on Education and Labor provided an illustrative, but non-exhaustive, list of illegal employer domination or interference:
 
 
 89
 The so-called "company-union" features of the bill are designed to prevent interference by employers with organizations of their workers that serve or might serve as collective bargaining agencies. Such interference exists when employers actively participate in framing the constitution or bylaws of labor organizations; or when, by provisions in the constitution or by laws [sic], changes in the structure of the organization cannot be made without the consent of the employer. It exists when they participate in the internal management or elections of a labor organization or when they supervise the agenda or procedure of meetings. It is impossible to catalog all the practices that might constitute interference, which may rest upon subtle but conscious economic pressure exerted by virtue of the employment relationship. The question is one of fact in each case. And where several of these interferences exist in combination, the employer may be said to dominate the labor organization by overriding the will of the employees.
 
 
 90
 S.Rep. 573, on S. 1958, 74th Cong., 1st Sess. 10 (1935), reprinted in 2 NLRA Leg.Hist. at 2309-10.
 
 
 91
 This language illustrates the broad proscription on employer interference that Section 8(a)(2) was designed to provide. In this case, Electromation actually engaged in several of the activities included in this non-exhaustive list of proscribed employer conduct: it "participate[d] in the internal management ... of a labor organization," it "supervise[d] the agenda or procedure of meetings," and, although the action committees did not have formal constitutions or by laws [sic], the company "actively participate[d] in framing ... [the purposes and goals statements] of labor organizations." Moreover, as is discussed in greater detail below, courts have consistently interpreted Section 8(a)(2) as a broad proscription against employer formation of or participation of almost any kind in employee committees or organizations which function in a representational capacity.
 
 3. Congressional Policies
 
 92
 In further support of its position, the company identifies two congressional policies underlying Section 8(a)(2): first, the protection of employees' freedom of choice; and second, the promotion of cooperation between employers and employees. We agree that both constitute legitimate goals of this section. Electromation argues that no violation of Section 8(a)(2) can be found based on "mere cooperation" between employer and employee. Indeed, as we observed in Chicago Rawhide Mfg. Co. v. NLRB, 221 F.2d 165, 167 (7th Cir.1955):
 
 
 93
 A line must be drawn ... between support and cooperation. Support, even though innocent, can be identified because it constitutes at least some degree of control or influence. Cooperation only assists the employees or their bargaining representatives in carrying out their independent intention. If this line between cooperation and support is not recognized, the employer's fear of accusations of domination may defeat the principal purpose of the Act, which is cooperation between management and labor.
 
 
 94
 See also NLRB v. Coca-Cola Bottling Co., 333 F.2d 181, 184 (7th Cir.1964) (fact that employee association had for many years operated vending machines in plant does not support domination finding); NLRB v. Magic Slacks, Inc., 314 F.2d 844, 847 (7th Cir.1963) ("In themselves, permission to use company time and premises, and similar acts of cooperation do not constitute such assistance and support as are prohibited by Section 8(a)(2).... Assistance and cooperation do not necessarily spell domination."); NLRB v. Post Publishing Co., 311 F.2d 565, 569-70 (7th Cir.1962) (union proceeds from operation of cafeteria and vending machines "is a permissible form of friendly cooperation designed to foster and resulting in uninterrupted harmonious labor-management relations, and is not the form of 'support' designed to interfere with, restrain or coerce employees in the free exercise of their right to choose or change their bargaining representative."). See also Modern Plastics Corp. v. NLRB, 379 F.2d 201, 204 (6th Cir.1967) ("the purpose of the Act is to encourage cooperation and discourage domination.").
 
 
 95
 Based on its opinion, the Board would appear to agree with that proposition. The company claims that, in light of the twin goals of freedom of choice and cooperation, Section 8(a)(2) must be construed to allow employers and employees to discuss matters of mutual interest concerning the employment relationship as long as the employees' choice about how to discuss such matters is not overridden. Even accepting that contention, it is far from clear that the Electromation employees' choice was not overridden in this case. In fact, the company "supported" the action committees in such a way that it possessed an unacceptable degree of control and influence. The company's involvement and control of membership, subjects, and decisions of the committees cannot fairly be characterized as "mere cooperation."
 
 4. Judicial Precedent
 
 96
 The company argues that this Circuit properly construed Section 8(a)(2) in Chicago Rawhide, 221 F.2d 165, in which we denied enforcement of a Board order finding that an employer had illegally dominated an employee committee, and that we should here apply the reasoning of Chicago Rawhide to find that there was no unlawful domination.
 
 
 97
 In Chicago Rawhide, the company and its employees together worked out an employee representation plan. The company allowed its employees to meet during working hours and contributed money to the employees' association on several occasions to help defray the expense of activities promoted by the association's recreation committee for the employees. Id. at 166-67. Because all of the acts cited by the Board as unfair labor practices in that case "actually show[ed] no more than either the Company's cooperation with, or the possibility of control of, the employee association," id. at 168, we denied enforcement of the Board's order.
 
 
 98
 We there stated that Section 8(a)(2) focuses on the subjective wishes of the employees and does not simply provide a list of objectively illegal employer acts. Explaining why the employer conduct in that case did not constitute illegal domination, we observed that:
 
 
 99
 Words and actions which might dominate the employees in their choice of a bargaining agent do not constitute domination proscribed by the Act unless the employees are actually dominated. The employer-employee relationship itself offers many possibilities for domination, which is one of the reasons for the original enactment of the Wagner Act, but actual domination must be shown before a violation is established. The Board is quite correct in pointing out employer assistance may be, and often has been, a means of domination. Assistance or cooperation does not always mean domination, however, and the Board must prove that employer assistance is actually creating company control over the [labor organization] before it has established a violation of Section 8(a)(2). "The test of whether an employee organization is employer controlled is not an objective one but rather subjective from the standpoint of the employees." NLRB v. Sharples Chemicals, Inc., 6 Cir., 209 F.2d 645, 652; NLRB v. Wemyss, 9 Cir., 212 F.2d 465, 471.
 
 
 100
 221 F.2d at 168. In Chicago Rawhide, this Court concluded that: "[n]either mere cooperation, preference, nor possibility of control constitute unfair labor practices; and the Board may not infer conduct that is violative of the Act from conduct that is not, unless there is a substantial basis, in fact or reason, for that inference." Id. See also Magic Slacks, 314 F.2d at 848 ("mere possibility of, or potential means for, interference and support do not form a substantial basis for an unfair labor practice finding in the absence of evidence that such potential has been realized").
 
 
 101
 To support the application of the Chicago Rawhide reasoning to this case, the company notes that other circuits have applied this interpretation of Section 8(a)(2). See, e.g., Federal-Mogul Corp., Coldwater Distrib. Ctr. Div. v. NLRB, 394 F.2d 915, 918 (6th Cir.1968) ("[i]nasmuch as it is the employees' freedom of choice that is protected by [Section 8(a)(2) ] the test of whether a labor organization is unlawfully dominated or supported is subjective from the standpoint of the employees"); NLRB v. Homemaker Shops, Inc., 724 F.2d 535, 545 (6th Cir.1984) ("The test of whether there is unlawful domination or assistance by the employer is a subjective one, turning on whether the employees are in fact being deprived of their freedom of choice"); Hertzka & Knowles v. NLRB, 503 F.2d 625, 630 (9th Cir.1974), cert. denied, 423 U.S. 875, 96 S.Ct. 144, 46 L.Ed.2d 106 (1975) (holding that court must judge "the Sec. 8(a)(2) issue from the subjective standpoint of the employees"); NLRB v. Northeastern University, 601 F.2d 1208, 1213 (1st Cir.1979) (Section 8(a)(2) violation must be based on "the subjective realities of domination of employee will").
 
 
 102
 It is true that these cases focus on the subjective wishes of the employees in considering whether a Section 8(a)(2) violation has occurred. The Board found these cases distinguishable, noting that in Northeastern University, Hertzka, and Chicago Rawhide, the courts denied enforcement in circumstances where the impetus behind the organizations emanated from the employees themselves. 309 N.L.R.B. at 996 n. 25.
 
 
 103
 In Airstream, Inc. v. NLRB, 877 F.2d 1291 (6th Cir.1989), and NLRB v. Streamway Div., Scott & Fetzer Co., 691 F.2d 288 (6th Cir.1982), the Sixth Circuit also focused its inquiry on the subjective perceptions of the employees, relying on the absence of employer anti-union animus or evidence that the employees perceived the employee organizations as anything other than mere communication devices to find that the employee committees at issue did not constitute labor organizations under Sections 2(5) and 8(a)(2). In Airstream, Inc., the court noted that because the Act does not encourage compulsory membership in labor organizations, " '[i]t is only when management's activities actually undermine the integrity of the employees' freedom of choice and independence in dealing with their employer that such activities fall within the proscriptions of the Act.' " 877 F.2d at 1297 (citations omitted). In its opinion, the Board noted these decisions but found that nothing in the statutory language, legislative history, or Supreme Court precedent compelled the Board to find under Sections 2(5) or 8(a)(2) that the employees perceived the organization to be a labor union. 309 N.L.R.B. at 996. Pointing out that an inquiry into the "purpose" of the organization at issue is more relevant, the Board explained:"[P]urpose" is different from motive; and the "purpose" to which the statute directs inquiry does not necessarily entail subjective hostility towards unions. Purpose is a matter of what the organization is set up to do, and that may be shown by what the organization actually does. If a purpose is to deal with an employer concerning conditions of employment, the Section 2(5) definition has been met regardless of whether the employer has created it, or fostered its creation, in order to avoid unionization or whether employees view that organization as equivalent to a union.
 
 
 104
 Id. at 996-97 (emphasis supplied). In his concurrence, Member Raudabaugh disagreed and suggested that employee perception is a significant element in evaluating the lawfulness of a labor organization under Section 8(a)(2). See 309 N.L.R.B. at 1013.
 
 
 105
 While it is important to consider, as these cases have, the subjective wishes of the employees, an interpretation of Section 8(a)(2) which would limit a court's focus to only the employees' subjective will, or which would require a finding of employee dissatisfaction with the organization, is at odds with the Supreme Court's holding in NLRB v. Newport News, Shipbuilding & Dry Dock Co., 308 U.S. 241, 249, 60 S.Ct. 203, 207-08, 84 L.Ed. 219 (1939). In Newport News, the Supreme Court held that the Board properly ordered the disestablishment of a company labor organization, notwithstanding the fact that the organization had operated successfully for many years to the apparent satisfaction of the employees. During the labor organization's existence, overwhelming majorities of the employees had participated in the election of representatives, the employer had never interfered or attempted to exert any influence over these elections, the employer had never objected to the employees joining labor unions, and the employer had never discriminated against employees based on union membership.
 
 
 106
 Notwithstanding this strong evidence of employer good faith and employee satisfaction, as well as the absence of any serious labor disputes during the existence of the company employee labor organization, the Supreme Court held that the provisions of Section 8(a)(2) precluded permitting the employee committee to continue in its representational capacity because:
 
 
 107
 The law provides that an employe [sic] organization shall be free from interference or dominance by the employer.... In applying the statutory test of independence, it is immaterial that the plan had in fact not engendered, indeed had obviated, serious labor disputes in the past, or that any company interference in the administration of the plan had been incidental rather than fundamental and in good faith. It was for Congress to determine whether, as a matter of policy, such a plan should be permitted to continue in force. We think the statute plainly evinces a contrary purpose....
 
 
 108
 Id. at 251, 60 S.Ct. at 208. In reaching its conclusion, the Court explained that "[w]hile the men are free to adopt any form of organization and representation whether purely local or connected with a national body, their purpose to do so may be obstructed by the existence and recognition by the management of an old plan or organization the original structure of which was not in accordance with the provisions of the law." Id. at 250, 60 S.Ct. at 208.
 
 
 109
 The company's suggestion that the Board can only find a violation where there is evidence of employee dissatisfaction was thus considered and squarely rejected by the Supreme Court in Newport News. See also NLRB v. Link-Belt Co., 311 U.S. 584, 588, 61 S.Ct. 358, 361, 85 L.Ed. 368 (1941) ("It would be a rare case where the finders of fact could probe the precise factors of motivation which underlay each employee's choice" whether to be represented by a union allegedly dominated by the employer); NLRB v. Donnelly Garment Co., 330 U.S. 219, 228-31, 67 S.Ct. 756, 761-63, 91 L.Ed. 854 (1947) (sustaining the Board's finding of an unfair labor practice where evidence established that labor organization was subjected to employer's domination, notwithstanding testimony of employees that they were not coerced into organizing or joining that labor organization).
 
 
 110
 Moreover, as we recently noted in Van Leer Containers, Inc. v. NLRB, 943 F.2d 786, 789 (7th Cir.1991) (citing Emerson Electric Co., 247 N.L.R.B. 1365, 1370 (1980); Picoma Indus., Inc., 296 N.L.R.B. No. 69, slip op. at 4 (1989)), "the Board has long held that it is impermissible to consider employee subjective reactions to determine whether employees have been threatened or coerced." Although this observation was made in the context of union certification, the principle is equally applicable to finding a violation under Section 8(a)(2).
 
 
 111
 To focus exclusively on employee subjective reactions in order to demonstrate a Section 8(a)(2) violation would, it seems to us, contravene the purpose of the Act. It is entirely possible that an extremely well-constructed employer-dominated labor organization could be so "camouflaged" as to persuade employees that it represented their best interests and preserved their free choice when in fact it did not. After all, this type of "company union" was precisely the conduct which the Wagner Act sought to eradicate from the workplace.
 
 
 112
 The company essentially argues that the Chicago Rawhide distinction between unlawful "support" and lawful "cooperation" should be applied to this case to find that Electromation's creation and administration of the action committees was merely cooperation. However, Chicago Rawhide is quite distinguishable from this case on its facts. First, in Chicago Rawhide, the employees initiated the first meeting with the employer and proposed the procedure for allowing employee involvement in the handling of grievances. Second, although the Chicago Rawhide committees met on company time, they met outside of the presence of management. Although these distinctions may at first appear minor, we believe that they provide a solid basis for differentiating the two employee committee situations. In addition, in Chicago Rawhide, company representatives did not determine the subject matters to be considered, select the members of the committees, or exercise a veto over what committee recommendations would be submitted to the upper management.
 
 
 113
 Moreover, as this Court later suggested in Ampex Corp., 442 F.2d at 85, where we declined to apply the Chicago Rawhide distinction between support and cooperation, the distinction generally applies only where the labor organization involved has some "reasonable claim to being an independent entity composed of employees and distinct from management." In this case, unlike Chicago Rawhide, the initial creation, structure, and administration of the action committees was substantially under the control of Electromation.
 
 
 114
 Some of the other cases relied upon by the company to demonstrate that the distinction between support and cooperation should be applied to this case similarly involved initial findings of managerial cooperation with labor organizations created and structured principally by employees (rather than employers). See, e.g., Coca-Cola Bottling Co., 333 F.2d 181 (employee members of employer-sponsored social organization hired lawyer to assist in converting organization into labor organization; court found organization not to be employer-dominated); Magic Slacks, 314 F.2d at 847 (committee initiated by employees held not to be employer-dominated, despite use of company time and resources, because employer played no part in internal functioning of committee); Post Publishing, 311 F.2d 565 (no finding of employer-domination through financial support where independent union had negotiated contracts with employer for over 35 years).
 
 5. The 1947 Taft-Hartley Act
 
 115
 Contrary to the company's suggestion, we do not believe that the enactment in 1947 of the Taft-Hartley Act reflected such a significant change in public policy that the original scope of Section 8(a)(2)'s proscriptions was altered. As explained more fully above in Section III.A, Congress not only reenacted Sections 2(5) and 8(a)(2) of the Act without change, but it also eliminated from the final bill a proposed Section 8(d)(3), which would have allowed an employer to form or maintain an employee committee to discuss working conditions in the absence of an exclusive representative. The Supreme Court has observed that the Taft-Hartley Act left intact the provisions of Sections 2(5) and 8(a)(2). See Cabot Carbon, 360 U.S. at 212, 215-17, 79 S.Ct. at 1021, 1022-24 (noting remarks by Senator Taft that the Senate and House conferees "specifically rejected all attempts to amend ... the provisions in subsection 8(a)(2) relating to company-dominated union and left its prohibitions unchanged"). Accordingly, we cannot conclude, as the company suggests, that the Board's decision somehow violates the new policy created by the enactment of the Taft-Hartley Act.
 
 
 116
 C. Substantial Evidence Supports the Board's Factual Findings
 
 
 117
 Electromation's primary challenge to the Board's factual findings is based primarily on its erroneous construction of Section 8(a)(2). The company also argues that Section 8(a)(2) requires proof of actual domination or interference with the employees' free choice. In Chicago Rawhide, we considered "acts [which] do no more than evidence the presence of potential means for interference and support, a possibility that is always present to some degree in an employer-employee relationship," but concluded that "without evidence of the realization of that potential, they do not furnish a substantial factual basis for an unfair labor practice finding." 221 F.2d at 170 (emphasis supplied). Electromation contends that there did not exist substantial evidence to support the Board's finding of unlawful domination, suggesting that, as in Chicago Rawhide, there existed merely the potential for domination by the employer in this case.
 
 
 118
 As the Board found, substantial evidence supports the finding of company domination of the action committees. First, the company proposed and essentially imposed the action committees upon its employees as the only acceptable mechanism for resolution of their acknowledged grievances regarding the newly announced attendance bonus policies. In response to perceived employee dissatisfaction with working conditions and a petition signed by 68 workers specifically protesting the changes in Electromation's attendance policy, the company unilaterally developed the concept of action committees. See Ampex Corp., 442 F.2d at 85 (upholding employer's unilateral creation of employee committee as evidence of committee's lack of independence from management).
 
 
 119
 The record also clearly shows that the employees were initially reluctant to accept the company's proposal of the action committees as a means to address their concerns; their reaction was "not positive." Nonetheless, the company continued to press the idea until the employees eventually accepted. Moreover, although the company informed the employees that they could continue to meet on their own, shortly after Electromation removed its management representatives from the committees due to the union recognition demand and announced that it would not work with the committees until after the union election, several of the committees disbanded. It was on this basis that the Board reasonably concluded that the company created the action committees and provided the impetus for their continued existence. 309 N.L.R.B. at 998.
 
 
 120
 The company played a pivotal role in establishing both the framework and the agenda for the action committees. Electromation unilaterally selected the size, structure, and procedural functioning of the committees; it decided the number of committees and the topic(s) to be addressed by each. The company unilaterally drafted the action committees' purposes and goal statements, which identified from the start the focus of each committee's work. Also, as was pointed out during oral argument, despite the fact that the employees were seriously concerned about the lack of a wage increase, no action committee was designated to consider this specific issue. In this way, Electromation actually controlled which issues received attention by the committees and which did not. See NLRB v. Reed Rolled Thread Die Co., 432 F.2d 70, 71 (1st Cir.1970) (where company management "studied ... and decided 'what we are going to do,' and discussed only the items the President wished to discuss," such employer control of meeting agenda supported domination finding); Bethlehem Shipbuilding Corp. Ltd. v. NLRB, 114 F.2d 930, 937 (1st Cir.1940), cert. dismissed, 312 U.S. 710, 61 S.Ct. 448, 85 L.Ed. 1141 (1941) (employer's instruction that employee committee could not concern itself with worker's compensation bill pending in state legislature supported domination finding).
 
 
 121
 Although the company acceded to the employees' request that volunteers form the committees, it unilaterally determined how many could serve on each committee, decided that an employee could serve on only one committee at a time, and determined which committee certain employees would serve on, thus exercising significant control over the employees' participation and voice at the committee meetings. Also, although it never became a significant issue because so few employees signed up for the committees, the initial sign up sheets indicated that the employer would decide which six employees would be chosen as committee members where more than six expressed interest in a particular committee. Ultimately, the company limited membership to five and determined the five to serve. In Pacemaker Corp., we noted the following in finding that substantial evidence supported the Board's finding of domination:
 
 
 122
 The Company determined the number of employees to serve on the committee, and the manner of their selection. The Company also decided the time, date and place of meetings and paid the employees for attending. Company officials presided over such meetings and we hold that such employer conduct constitutes domination and support of the committee.
 
 
 123
 260 F.2d at 883 (citation omitted).
 
 
 124
 Also, the company designated management representatives to serve on the committees. Employee Benefits Manager Dickey was assigned to coordinate and serve on all committees. In the case of the Attendance Bonus Program Committee, the management representative--Controller Mazur--reviewed employee proposals, determined whether they were economically feasible, and further decided whether they would be presented to higher management. This role of the management committee members effectively put the employer on both sides of the bargaining table, an avowed proscription of the Act. See Hearings on S. 1958 before Sen. Comm. on Educ. and Labor, 74th Cong., 1st Sess. 40-41 (1935), reprinted in 1 NLRA Leg.Hist. at 1416-17.
 
 
 125
 Finally, the company paid the employees for their time spent on committee activities, provided meeting space, and furnished all necessary supplies for the committees' activities. While such financial support is clearly not a violation of Section 8(a)(2) by itself, see, e.g., Chicago Rawhide, 221 F.2d at 170 (citing Wayside Press v. NLRB, 206 F.2d 862 (9th Cir.1953)) ("Allowing the use of Company property, and even time, for employee meetings is not in itself an unfair labor practice."), in the totality of the circumstances in this case such support may reasonably be characterized to be in furtherance of the company's domination of the action committees. We therefore conclude that there is substantial evidence to support the Board's finding of unlawful employer domination and interference in violation of Section 8(a)(2) and (1).
 
 IV.
 CONCLUSION
 
 126
 The Supreme Court has explained that domination of a labor organization exists where the employer controls the form and structure of a labor organization such that the employees are deprived of complete freedom and independence of action as guaranteed to them by Section 7 of the Act, and that the principal distinction between an independent labor organization and an employer-dominated organization lies in the unfettered power of the independent organization to determine its own actions. See Newport News, 308 U.S. at 249, 60 S.Ct. at 207-08; Cabot Carbon, 360 U.S. at 214, 79 S.Ct. at 1022. The Electromation action committees, which were wholly created by the employer, whose continued existence depended upon the employer, and whose functions were essentially determined by the employer, lacked the independence of action and free choice guaranteed by Section 7. This is not to suggest that Howard and the other management representatives were anti-union or had devious intentions in proposing the creation of the committees. But, even assuming they acted from good intentions, their procedure in establishing the committees, their control of the subject matters to be considered or excluded, their membership and participation on the committees, and their financial support of the committees all combined to make the committees labor organizations dominated by the employer in violation of the Act.
 
 
 127
 Accordingly, because we find that substantial evidence supports the Board's factual findings and that its legal conclusions have a reasonable basis in the law, we affirm the Board's findings and enforce the Board's order.
 
 
 128
 ENFORCED.
 
 
 
 *
 The Honorable Hubert L. Will, District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 The following organizations have filed amicus curiae briefs in support of the company: the Labor Policy Association, the American Society for Quality Control, Development Dimensions, Quality & Productivity Management Association, American Productivity & Quality Center, and Arthur D. Little, Inc.; and the National Association of Manufacturers, the Chamber of Commerce of the United States of America, the American Iron and Steel Institute, and the Coalition of Management for Positive Employment, Training and Education. The following organizations filed amicus curiae briefs in support of the Board and Intervening Respondents: Labor Notes and United Electrical, Radio and Machine Workers of America; the American Federation of Labor and Congress of Industrial Organizations; and the American Civil Liberties Foundation
 
 
 [2]
 In its reply brief and at oral argument, see Reply Br. of Petitioner at 9-10, the company also argues that the Board's analysis of Section 8(a)(2) is contrary to Section 8(c) of the Act, which provides in pertinent part that "[t]he expressing of any views, argument, or opinion ... shall not constitute or be evidence of an unfair labor practice under any provisions of [the Act] if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. Sec. 158(c). With all due respect to the company, its actions in creating and administrating the action committees can hardly be described as the "expressing of any views, argument, or opinion." Without a doubt, Electromation's actions in this case went far beyond mere encouragement of its employees to arrange a collective means of expression