**AIRSTREAM, INC., Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

**Nos. 88–5431, 88–5568.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 9, 1989.

Decided June 19, 1989.

Roger B. Jacobs (argued), Airstream, New York City, for Airstream, Inc.

Aileen A. Armstrong, Dep. Asso. Gen. Counsel, Howard E. Perlstein, Jesse Gill, Barbara Atkin, Laurence S. Zakson (argued), N.L.R.B. Office of the Gen. Counsel, Washington, D.C., Frederick Calatrello, Director, N.L.R.B., Region 8, Cleveland, Ohio, Elliot Moore, Washington, D.C., for N.L.R.B.

* The Honorable Charles W. Joiner, Senior U.S. District Judge for the Eastern District of Michigan, sitting by designation.

Before KRUPANSKY and WELLFORD, Circuit Judges, and JOINER, Senior District Judge.*

WELLFORD, Circuit Judge.

On January 21, 1985, a petition for certification was filed by the United Automobile, Aerospace and Agricultural Workers of America, AFL–CIO (the Union) to represent all production and maintenance employees employed by defendant Airstream, Inc., at three of its facilities in Jackson Center, Ohio. Within a month the Regional Director for Region 8 of the National Labor Relations Board (NLRB) approved a stipulation for a consent election to be held on March 15, 1985. The election was held as scheduled resulting in a vote against the union of 181 to 106.[1]

The Union then filed a timely unfair labor practice charge against Airstream alleging violations of the National Labor Relations Act (the Act). The Union claimed that Airstream threatened employees with retaliation and improperly promised benefits if they voted against the Union. The Union also alleged that Airstream formed a labor organization and unlawfully dominated and supported that organization.

In response to the union charges the Regional Director issued a complaint, later amended at trial, alleging that Airstream violated Sections 8(a)(1) and (2) of the Act. After a hearing, the Administrative Law Judge (ALJ) recommended that Airstream be found in violation of both sections, and that the election be set aside and a new election held. Airstream filed exceptions, and the NLRB adopted all the ALJ's findings, but modified his recommended order. Airstream has filed a petition for review, and the Board has filed a cross-application for enforcement. Airstream manufactures and services recreational vehicles in Jackson Center. Approximately 310 employees were involved in Airstream's election controversy in 1985.

1. The number of challenged ballots was insufficient to affect the results, and the Union filed objections to the conduct of the election.

Nine days after the Union filed its election petition, Airstream posted on plant bulletin boards and distributed to its employees a notice of its new "Awareness Program." In order to keep employees "better informed," Airstream advised that it was implementing a program consisting of periodic notices that would "contain information on subjects that affect you, your job, and the Company." The Union contends that this procedure unlawfully granted a benefit to Airstream employees. The ALJ, however, found that the program amounted to nothing more than an employer propaganda device and as such did not constitute a violation of the Act.

Four days before the election, Airstream posted and also mailed to its employees a letter signed by Gerard LeTourneau, its president, stating reasons why the employees should not vote for the Union. It pointed out that the Union could not guarantee job security and described a loss of jobs at other plants where employees were represented by this Union. The letter also warned that, in the event the Union won the election, the employees' wages could be decreased, their existing pension and profit-sharing plans could be lost, and they could be forced to strike against their will. The letter concluded with the words "VOTE NO" in large print.

In December of 1984, Airstream had announced that, effective January 1, 1985, it would terminate the then existing "sick/personal day program" and institute in its place an "absentee control policy" and an attendance incentive program. Under the prior sick/personal day program, the employees were entitled to three paid sick or personal days off each year without explanation. The new program provided instead for progressive discipline for excessive absenteeism and cash bonuses for perfect attendance. After the Union filed its election petition, however, Airstream began to retreat from its new absentee program, first to allow for excused medical absences and then finally scrapping the new program altogether. The bonus incentives for perfect attendance were left in place. LeTourneau testified that the new policy was abandoned as too cumbersome and difficult

to administer. The ALJ found this testimony not to be credible because LeTourneau gave a different explanation to the employees, saying he withdrew the policy in response to their "concerns" and "suggestions." Also, the ALJ found the surrounding circumstances suspect because "the Company modified its approach to the attendance problem by withdrawing the discipline while continuing for the time being to hold out a benefit, the attendance bonus program." The ALJ, therefore, concluded that the Company violated Section 8(a)(1) by granting a benefit and redressing employee grievances by withdrawing the disciplinary point system and restoring the previously existing three personal absence days.

A week before the Union petition notice Airstream annoyed many employees by installing at two plants timeclocks which had not previously been used, except at one facility, for several years. Soon after the Union filing, Airstream attempted to ameliorate employee discontent by increasing by three minutes the lunch break for those employees who wished to leave the plant without making use of a separate washup period. Previously, employees had a thirty-minute lunch period, preceded by a voluntary three-minute washup period. Only those employees who took advantage of the washup were given the three minutes. The ALJ and the Board deemed this increase to be an improper benefit and found that the Company's stated reasons for the time change not credible and lacking any legitimate business justification. The ALJ therefore found the extension of the lunch break to be an unfair labor practice because it tended to discourage employee support for the Union.

Another Union objection concerned a new Airstream project known as the Argosy line. During January 1985, the Company began hiring employees for this project on the basis of "seniority, skill, and ability ... subject to qualifications needed." Prior to January 28, permanently laid off employees who had previously worked for Airstream and then later returned were not allowed seniority credit for their prior em-

ployment. After January 30, however, Airstream altered its policy by allowing employees seniority credit for purposes of bidding on Argosy line jobs. LeTourneau testified that he made this change because he decided that experienced, skilled employees for the new project were needed. The ALJ found this testimony not to be credible because LeTourneau's testimony was different from the explanation he gave his employees, which was, again, that the change resulted from employee "concerns" and "suggestions." The ALJ found it "incredible" that Airstream suddenly discovered a business need for this change in late January shortly after the Union filed its election petition, while the old policy was continued for a week after the Union petition was filed. The ALJ consequently found that Airstream expanded seniority rights in order to discourage employee support for the Union, another claimed violation of Section 8(a)(1).

The Union also contends that Airstream unlawfully instituted a program of lunches for employees celebrating their birthdays. LeTourneau initially testified that the Company decided in November 1984 to institute the program. He later testified that he did not decide on the program until mid-December 1984. The first such luncheon was not actually held until the last week of January 1985 because, according to LeTourneau, it was too difficult to schedule the first luncheon during the holidays. The ALJ once again rejected LeTourneau's explanations and found that the Company initiated the birthday luncheon program after the Union filed its election petition as an added means of discouraging employee support for the Union.

. Perhaps the most important element of the Union's complaint was Airstream's formation, in late February, of the "President's Advisory Council" (PAC).[2] For some time before the election campaign began, the Company had held "rap sessions" in which employees, on a rotating basis, attended monthly meetings in which LeTourneau would invite questions and suggestions. After notifying employees of the formation of the PAC, Airstream on March 1 summoned its employees by groups, on departmental lines, to vote for three choices for employee representatives on PAC. The Company posted the results of this selection process on plant bulletin boards. The first meeting of PAC representatives was scheduled only a few days before the scheduled election. LeTourneau discussed at this meeting the comparative merits of the attendance bonus program, which he preferred, and the personal sick day program. The representatives present, however, expressed a strong preference for the old policy of sick and personal days. LeTourneau agreed to review the matter but said he could not institute any changes until after the election. LeTourneau also asked for suggestions to improve the work rules. LeTourneau testified that the first meeting was merely for organizational purposes, but the ALJ rejected this explanation and concluded that PAC was formed and actually began functioning before the Board-conducted election.

A PAC meeting took place again within a week after the election in dispute. After this meeting LeTourneau announced reinstatement of the personal sick day program as of April 1. Another PAC meeting took place on April 3 at which time the job bidding system was discussed. Airstream thereafter altered these practices in accord with suggestions of employee representatives. The ALJ found, however, that LeTourneau did not discuss pay at these PAC meetings and that employee representatives were not permitted to intervene in employee-supervisor problems. LeTourneau considered the PAC sessions to be an alternative to the former rap sessions, which he felt had been losing their effectiveness. In letters to employees during the election campaign period LeTourneau referred to PAC as "your voice in your Company," and stated that the company was taking up the personal/sick day issue as its "first order of business." In the Board proceedings PAC was listed as a "party in interest" together with Airstream because the ALJ determined that, in effect,

---

**2.** Approximately two-thirds of the Board's brief dealt with this issue.

it was formed as an illegal company dominated "union."

Objections by the Union to the election results included the following: (1) Airstream's promise of benefits to influence the outcome of the election; (2) the formation of a company committee (PAC) "to deal with management"; and, (3) Airstream's predictions of strikes and loss of benefits in the event of a union victory.

## 1. *PAC as an Illegal Organization*

██ The ALJ found that "rap sessions" between Airstream management and labor had been taking place for some four years prior to the election campaign. At these meetings employees "were invited to ask questions and *make suggestions.*" (Emphasis added.) The ALJ found that the evidence did not indicate any actual changes in working conditions or any resolution of grievances as a result of these PAC sessions. He recognized, as did the General Counsel, that the purpose of these meetings was to maintain communications in a growing company and were not improper or unlawful per se under the NLRA.

The ALJ noted that in March the gatherings in the revised form of PAC meetings began to take place "on paid company time." The former "rap sessions" were, however, also on paid time. The record does not indicate whether either the "rap sessions" or the PAC meetings were voluntary, involuntary, or merely encouraged by management. In any event, no change in the policy concerning voluntariness was indicated with respect to PAC meetings. Employees by separate departments chose representatives or alternatives to attend PAC meetings for the first meeting on March 11 which the ALJ found had a "written agenda" that included "rules of conduct review" and "attendance bonus versus sick/personal days." At this meeting, LeTourneau had the employee representatives draw lots for staggered initial terms and "listened to employee complaints about the rules." Input was obtained on the attendance and leave policy, but no change was to be made pending the election. Ideas were sought for improving the work rules. The

ALJ determined that this meeting was not merely an organizational meeting.

After the election a " 'recommended' sick pay/personal day program" was distributed which the ALJ found to be a "revival of the former system," subject to review by the employees. The program was implemented on April 1. The subject of the next meeting was the job bidding system, with which the ALJ noted "satisfaction in general," taking into account the extension of seniority rights in bidding on Argosy line jobs. Other minor improvements were also suggested and months later implemented. The ALJ pointed out that several back pay adjustments and a change in the Christmas holiday period were made as a consequence of complaints at PAC meetings.

The ALJ observed that LeTourneau "restricted the structure and activities of PAC in order to assure that this pussycat would not turn into a tiger." He noted that PAC had no purported officer structure, did not deal with pay issues, and did not generally involve itself in "problems between employees and their supervisors." The ALJ also noted that LeTourneau, after investigating the possibility of an "advisory group," informed the employees in February that he was ready to proceed with it but "could not do anything until after the Union election." Names of PAC representatives were placed on Airstream bulletin boards.

A "labor organization" is defined by Section 2(5) of NLRA as:

> any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or part, of dealing with employees concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

Without disturbing any of the findings of the ALJ, it is clear that PAC did not involve itself in or purport to accomplish the settling of "grievances," nor did it attempt to resolve "labor disputes" with individual employees before the election in question. The ALJ conceded that PAC did not "deal with" wages or rates of pay. The ALJ apparently found that discussions with rep-

resentatives at a March 11 meeting concerning personal/sick days and the attendance bonus program constituted dealing with employees over "hours of employment" or "conditions of work." We must disagree.

As indicated by the ALJ, LeTourneau told Dennis Faulden that he could not discuss "survey results" on the attendance matter during the campaign and until after the election. At the March 11 meeting LeTourneau did listen to employee complaints about Airstream rules, but this was no different from the prior "rap sessions." Airstream took no action during the course of the Union campaign either at a PAC meeting or as an announced consequence of such a meeting that could reasonably be construed to involve hours of employment, conditions of work, or the settling or handling of grievances or employee disputes. The basic function continued to be a means of communication between management and employees.

The leading case relied upon by the ALJ and the Board for their conclusion that PAC was a labor organization within the meaning of the Act is *N.L.R.B. v. Cabot Carbon Co.*, 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175 (1959). The issue in *Cabot Carbon* was whether regular meetings of "Employee Committees" established to consider and handle "grievances" constituted formation by the employer of "labor organizations." *Id.* at 204, 79 S.Ct. at 1017. In *Cabot Carbon* the employer prepared committee by-laws for adoption by the employees, which were adopted and published in a company manual. The "handling of grievances" was specifically included as a purpose of the by-laws, and there followed proposals on "seniority job classifications, job bidding, makeup time, overtime records, time cards, a merit system, wage corrections, working schedules" and the like. *Id.* at 207, 79 S.Ct. at 1018. A "Central Committee" of the Employee Committee met with management to discuss "matters covering nearly the whole scope of the employment relationship." *Id.* at 208, 79 S.Ct. at 1019. While construing the language of Section 2(5) "dealing with" as having a broader meaning than "bargain

with," the court noted particularly that the Employee Committee met regularly with management and made specific proposals about all manner of work conditions, rates of pay, and hours of employment, and had the authority to handle grievances. *Id.* at 213, 79 S.Ct. at 1021. The *Cabot Carbon* scenario is a far cry from the circumstances of this case. The Court in *Cabot Carbon* concluded that the Board's order finding the Employee Committee to be a labor organization would not prevent employers and employees from discussing together, without the intervention of a union or labor organization, "matters of mutual interest concerning the employment relationship." *Id.* at 218, 79 S.Ct. at 1024.

In *N.L.R.B. v. Streamway Division of Scott and Fetzer Co.*, 691 F.2d 288 (6th Cir.1982), we discussed the effect of *Cabot Carbon* and concluded that an employee committee intended to define and identify "problem areas" and to elicit "suggestions and ideas for improving operations" was not a "labor organization." The committee in *Streamway* included elected employee representatives with rotating terms and was formed after one unsuccessful union campaign and several months before another such campaign. The company changed its vacation policy after discussions with the committee. *Id.* at 295 n. 11. We stated in *Streamway* that "not all management efforts to communicate with employees concerning company personnel policy are forbidden on pain of violating the Act. An overly broad construction of the statute would be as destructive of the objects of the Act as ignoring the provisions entirely." *Id.* at 292.

In support of that rationale, *Streamway* adopted with approval this language of Judge John Minor Wisdom:

[A]n inflexible attitude of hostility toward employee committees defeats the Act. It erects an iron curtain between employer and employees, penetrable only by the bargaining agent of a certified union, if there is one, preventing the development of a decent, honest, constructive relationship between management and labor. The Act encourages

collective bargaining, as it should, in accordance with national policy. The Act does not encourage compulsory membership in a labor organization. The effect of the Board's policy here is to force employees to form a labor organization, regardless of the wishes of the employees in the particular plant, if there is so much as an intention by an employer to allow employees to confer with management on any matter that can be said to touch, however slightly, their "general welfare". There is nothing in *Cabot Carbon,* or in the Labor Management Act, or in any other law that makes it wrong for an employer "to work together" with employees for the welfare of all.

*N.L.R.B. v. Streamway Division,* 691 F.2d at 292–93 (quoting *N.L.R.B. v. Walton Mfg. Co.,* 289 F.2d 177, 182 (5th Cir.1961) (Wisdom, J., dissenting)). Similarly, in *Federal–Mogul Corp., Coldwater Distribution Center Division v. N.L.R.B.,* 394 F.2d 915, 918 (6th Cir.1968), we stated:

> It is only when management's activities actually undermine the integrity of the employees' freedom of choice and independence in dealing with their employer that such activities fall within the proscriptions of the Act.

*See also Modern Plastics v. N.L.R.B.,* 379 F.2d 201, 204–05 (6th Cir.1967).

In a later decision, *Lawson Co. v. N.L.R.B.,* 753 F.2d 471 (6th Cir.1985), this court interpreted the above cited cases narrowly holding that an employer with "an antitrust union animus," which set up a committee "at the height of a union organizational campaign," had formed a company-dominated "labor organization" under the Act. The ALJ and the Board had found that Lawson Company formed and dominated a "labor organization," and the panel upheld this finding as supported by substantial evidence, indeed by "overwhelming evidence in the record." *Id.* at 477. It should be noted, however, that in *Lawson* the employer, unlike Airstream, had no previous history with "rap sessions." In addition, at a number of unprecedented meetings immediately following the onset of a union organizational campaign, Lawson management repeatedly advised employees

that there was no need for a union and that they should retrieve their authorization cards. *Id.* at 473. Within two weeks after the union filed a representation petition, Lawson Company held a meeting of its employee representative committee to discuss changes in "holidays, hospitalization, insurance, death-in-family benefits, and a disciplinary appeals system," among other items directly relating to wages, rates of pay, hours of employment, and conditions of work. *Id.* at 477. Lawson, during the union campaign, issued a written report "which implied that the committee had been instrumental in obtaining improvements for all employees." *Id.* at 477. Clearly these were matters covered expressly in Section 2(5) (29 U.S.C. § 152(5)).

In *N.L.R.B. v. Associated Machines,* 219 F.2d 433 (6th Cir.1955), this court refused to enforce a Board order against an employer that had formed an employee committee with elected representatives that discussed with management "production problems, plant efficiency ... and other problems of mutual interest." *Id.* at 435. Chief Judge Simon found that only a few individual complaints of no major collective policy import were considered and thus held the committee not to be a labor organization.

We believe that the circumstances of this case are closer to the *Streamway* than the *Lawson* model. Under the statutory language as discussed in *Cabot Carbon,* we are not persuaded that substantial evidence supported the conclusion reached by the ALJ and the Board that the PAC was a "labor organization" formed for the purpose of inducing "adherence of employees ... in the mistaken belief that it was truly representative and afforded an agency for collective bargaining." *Federal–Mogul Corp. v. N.L.R.B.,* 394 F.2d 915, 918 (6th Cir.1968) (quoting *N.L.R.B. v. Pennsylvania Greyhound Lines,* 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831 (1938)) and quoted also in *Lawson Co.,* 753 F.2d at 477.

There is little if any evidence that Airstream made, or promised to make, during the pendency of the union campaign and

before the election any significant change in working conditions, pay, or hours of employment. We find also no substantial evidence that the formation of PAC inhibited adversely the organizational campaign of the Union when only one meeting took place during the course of a nearly two-month campaign and when the participants at the meeting considered and discussed only rules of worker conduct and sick day-attendance proposals.

*Lawson,* in contrast, involved an employer that conducted unprecedented meetings with employees to urge that no union was needed and that they should retrieve their authorization cards. Lawson Company at the time told its managers to advise employees that stores would be closed if the union won the election. The employer implied that committee meetings with employees during the organizational campaign resulted in a number of new and improved policies, programs, and benefits including disciplinary appeals. In these and numerous other overt acts, Lawson Company displayed strong and persistent anti-union animus, employing devices very different in manner and degree from the activities with which Airstream is charged.

Having decided that the Act was not violated with respect to the PAC activities, at least to the extent that the election was not influenced by the formation of PAC, we pass to the other charges involved in this appeal.[3]

2. *Changing Established Working Conditions*

◼ In order for employer conduct to meet the test of Section 8(a)(1) of the Act, it must be proved that the employer engaged in "conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization." *N.L.R.B. v. Exchange Parts Co.,*

375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964). The Board points to the following conduct that it contends did fall within this definition as "immediately favorable" to the employees and which had the purpose of influencing employees adversely against the union: (1) a monthly catered birthday lunch; (2) a three minute extension of lunch to employees who "punched out"; (3) an amendment of absentee control and the attendance incentive program; and (4) a modification of the seniority system in job bidding.

Because these actions allegedly took place during the organization campaign and before the election, we will assume that Airstream acted in these respects with an improper motive of influencing the election. *See N.L.R.B. v. State Plating & Finishing Co.,* 738 F.2d 733, 740 (6th Cir.1984) ("granting benefits to employees before an election constitutes an unfair labor practice if motivated by a desire to induce votes against a union"). *State Plating* involved wage increase and shifted the burden to the employer to justify the increase. We believe that the burden of showing no improper purpose should be on Airstream to the extent that any benefits were shown to have been granted to employees during the critical period before the election. *State Plating, supra.*

Airstream contends that it announced the birthday lunch program in 1984 before any notice of the union election campaign. The ALJ confirmed that the Company decided in late 1984 to institute such a program but that it was not actually implemented until January 1985. Nevertheless, the ALJ found that because of the delay and inconsistent explanations, "the Company initiated the birthday program after the Union filed its election petition." We are unsure about the ALJ's finding that Airstream initiated this program during the campaign "as a means of discouraging employee sup-

---

**3.** In *N.L.R.B. v. H & H Plastics Mfg. Co.,* 389 F.2d 678, 681 (6th Cir.1968), a case in which a majority of employees signed cards acknowledging a union as their representative, we intimated that the more relevant dates concerning an alleged company-dominated union and validity of an election were the beginning of the organization-

al campaign and the election itself. Employer dealings with the allegedly dominated union concerning grievances, labor disputes, wages, rates of pay, and the like after the election in dispute may, however, appropriately be considered by the Board.

port for the Union." The ALJ mentioned that employees whose birthdays occurred in December 1984 might be offended by their omission, but it is difficult to understand why this delay would then be intended to discourage union support. We find little basis in the facts to draw the adverse inference against the employer in light of a program announced in 1984 and to be instituted in the future.

The purported three minute increase in the lunch break and the modified employee attendance policy were also found to lack valid purposes. The ALJ found that these policy changes were undertaken "in order to mollify employee discontent over the installation of time clocks" and measures to increase employee attendance. If taken to mollify employee discontent, these modifications arguably constituted a benefit, albeit a minor one, to Airstream employees. We doubt that these factors, standing alone, were sufficient to influence the election.

We attach no significance whatsoever to the repositioning of timecard racks to ease congestion at the recently installed time clocks. The ALJ described the reinstallation of time clocks in two of Airstream's plants as rubbing salt into the employees' wounds after the announcement of a new policy designed to counter a longstanding problem in employee attendance. Although Mr. LeTourneau cited purported business reasons for this policy—e.g., to improve attendance—and its partial abandonment during the union campaign, the ALJ determined that "the Company modified its carrot and stick approach to the attendance problem by withdrawing the stick (the disciplinary point system) while continuing ... to hold out the carrot (the attendance bonus program)." The ALJ found little credibility in the reasons offered by LeTourneau and determined that Airstream's justification for the resultant employee benefit was unpersuasive. Again, we find that this decision had an adequate basis, but, once again, express uncertainty as to whether this action was a sufficient ground to set aside the election.

With respect to the Board's determination that a change in seniority policy in late January 1985 violated the Act, we find ourselves in disagreement with the ALJ. A careful reading of the testimony relating to this policy indicates that it was limited to the Argosy line and that the company's action cannot reasonably be inferred to be intended to influence the election. The ALJ was correct in noting that "seniority is only one factor in the Company's job bidding system." There is no dispute that hiring of skilled production people was to commence on this "innovative product" in January of 1985. An exception was made to recognize the prior experience and skill of laid-off employees in the Argosy bidding process. That this change may have been due in part to employee "concerns" does not make it anti-union action. The reason given by the ALJ for his finding against Airstream was that the new policy "did not result in any business benefit to itself." We find no basis for such a conclusion or for the conclusion that this change in policy, under all the circumstances, extended to *all* job bidding prior to the election. We reject, therefore, this finding of an unfair labor practice with respect to the Argosy project.

### 3. Campaign Communications and Use of Bulletin Board

▪ We find the communications made by Airstream to its employees, such as the announcement of the "Awareness program," to be an acceptable expression by Airstream of its legitimate concerns and opposition to the designation of the Union as a bargaining representative. The election contest was, indeed, a hard fought one in which Airstream advised the employees of factors mitigating against certification of the Union which it felt deserved attention, we find that Airstream's communicating opposition to the union efforts to organize, taken as a whole, did not unlawfully interfere with, restrain, or coerce employees in the exercise of their rights.

The ALJ conceded that a company policy required management approval to use the bulletin board in the main plant. As noted by the ALJ, it was used primarily for "com-

pany business," but sometimes was also used, with management's approval, for "social" or "public interest" purposes. Consistent with Airstream's written policy, company supervisors regularly removed "unapproved notices" from the board, including union literature while the campaign was in progress. No evidence indicated that any union representative requested permission to post union literature on the main plant bulletin board, and an Airstream official, Carman, testified that "he probably would have approved such a notice for posting" if requested. The Board concluded that removal of such union notices was discriminatory, displayed "animus against the union," and thus violated Section 8(a)(1) of the Act. The ALJ concluded that this conduct interfered with the election because Airstream "tolerated the unauthorized use of a bulletin board by PAC."[4]

We find no indication in the record that PAC did not receive approval for posting notices. Witness Armstrong testified that he posted PAC notices in his department on a board used for blueprints and "sort of took it over." Armstrong testified that to his knowledge the bulletin boards in other departments were not used for PAC notices.

We conclude that PAC was not a competing company-dominated labor organization in competition with the Union. We believe the Board's finding of discriminatory animus on the part of Airstream against the Union by reason of bulletin board policy or conduct must therefore be remanded for further consideration in light of these circumstances and in light of the obvious difference between unauthorized use of a main plant bulletin board, and appropriation, approved or unapproved, of a department bulletin board for PAC notices. Therefore, we decline to enforce the Board's order that PAC be disbanded, and we set aside the conclusion that the initiation and operation of PAC before the election and up to the time of the contest thereof was an unfair labor practice.

We affirm several of the Board's conclusions that certain activity relating to the extension of lunch breaks and modification of the Company's attendance policies may have or did constitute unfair labor practices. We remand for further consideration, however, as to whether these violations, relatively minor in their nature compared to the other charges made in this case, are sufficient to mandate a new election.

We also remand for further consideration of whether the use of a bulletin board by PAC in one department was discriminatory and displayed anti-union animus because unauthorized union material was removed from the bulletin board in the main plant during the union campaign. If deemed violative of the Act, the Board or the ALJ should set out its reasons for such a conclusion; this factor may be considered together with the lunch break and attendance policy change in determining the validity of the election.

---

**4.** The ALJ conceded that different bulletin boards were involved in the alleged actions of taking down union literature and "tolerating" PAC notices.