NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

WEBCOR PACKAGING, INC., Respondent.

No. 96–5423.

United States Court of Appeals, Sixth Circuit.

Argued April 28, 1997.

Decided July 11, 1997.

Aileen A. Armstrong, Dep. Associate Gen. Counsel, National Labor Relations Board, Appellate Court Branch, Washington, DC, Margaret Gaines Neigus (argued and briefed), National Labor Relations Board, Washington, DC, for Petitioner.

Lawrence J. DeBrincat (argued and briefed), Brian M. Smith, Troy, MI, for Respondent.

Before: GUY, MOORE and COLE, Circuit Judges.

MOORE, J., delivered the opinion of the court, in which COLE, J., joined. GUY, J. (p. 1125), delivered a separate opinion concurring in the result only.

## OPINION

MOORE, Circuit Judge.

The National Labor Relations Board (NLRB) petitions this court to enforce its order setting aside union election results and disestablishing a labor organization which Webcor created and dominated in violation of § 8(a)(2) of the National Labor Relations Act (NLRA). For the reasons discussed below, we enforce the order.

## I. FACTS

Neither party challenges the following findings of the Administrative Law Judge (ALJ): In 1990 Robert Sibilsky joined Respondent Webcor as vice-president for operations, bringing with him a new management strategy involving increased worker-management cooperation. He soon established an "Employee Involvement Steering Committee," composed of three workers and two managers, to investigate ways to improve safety, productivity, quality, and other areas

that did not involve what he called "policy issues," i.e., employer-employee relations. The Steering Committee did not discuss employer-employee relations and is therefore not at issue in this case.

The Steering Committee was quite popular with the workers, but not in the way Sibilsky had hoped. The company had encouraged employees to submit suggestions to the committee; many of these suggestions turned out to concern employer-employee relations. Sibilsky's response was to propose the formation of another committee, a "Plant Council," to address these policy issues. At the same time, the Allied Industrial Workers Union started an organizing drive at Webcor (apparently as a result of other, less popular, changes that Sibilsky had instituted). The decision to create the Plant Council was apparently unrelated to the union activity.

On February 22, 1991, Webcor held an election for the employee members of the Plant Council; of the twenty-eight ballots cast, eighteen were blank. Furthermore, four of the five persons elected refused to serve. Sibilsky took this as an indication of indifference at best and temporarily scrapped the Plant Council idea. He nonetheless circulated a "Dear Employee" letter asking workers to vote against unionization; the letter included a statement that the company had responded to employee concerns by "implement[ing]" the Plant Council and an employee involvement program in response to employee concerns. *See* Joint Appendix (J.A.) at 63 (Letter).[1]

On April 18 the workers voted against unionization by a twenty-one-to-fourteen margin. Two weeks later the company held another election for the Plant Council. This election was much more successful than the first and elected to the Council five workers, all of whom had volunteered to serve if elected.

The Plant Council included three management members as well as the five workers. Although in theory the Council was to make decisions by majority vote, in practice it

worked by consensus. An employee who wanted to raise an issue before the Council would usually place a written suggestion in a box and then attend the meeting at which the suggestion was discussed. The Council was meant to, and did, address "work rules, wages, and benefits"; it in fact addressed and made several proposals that the company subsequently adopted. The Council met during working hours and the company covered all expenses, including wages for the time spent.

The NLRB General Counsel brought this action claiming that the Council was an employee representation committee under company domination and as such violated the NLRA. Webcor replied that the Council was an exemplar of worker-management cooperation and merited praise rather than legal attack. The General Counsel's view prevailed before the ALJ and the NLRB, both of which held that the Plant Council was an illegal company-dominated labor organization and ordered the company to disestablish the Council and hold new union elections. The General Counsel now petitions to have the Board's order enforced. We have jurisdiction over such petitions under 29 U.S.C. § 160(e).

## II. DISCUSSION

The National Labor Relations Act provides that it constitutes an "unfair labor practice for an employer . . . to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." NLRA § 8(a)(2), codified at 29 U.S.C. § 158(a)(2). The ALJ and the Board held that the Council was a labor organization and that the company dominated it; Webcor disputes both conclusions.

### A. Whether the Plant Council is a Labor Organization under the Act

Webcor first argues that the Board erred in concluding that the Council was a labor

---

1. The letter also proclaimed that "[t]hese responses to employees were made without a union! They occurred because of a cooperative spirit. Employee Involvement, developed long before the union was present, and Plant Council are designed to further develop that relationship." J.A. at 63.

organization. The NLRA defines "labor organization" as

> any organization of any kind, or any agency or *employee representation committee* or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

29 U.S.C. § 152(5) (emphasis added). The Supreme Court has long held that this statutory definition is susceptible to a broad interpretation and that the Board should be accorded great latitude in delineating its contours. *See Marine Engineers Beneficial Ass'n v. Interlake S.S. Co.,* 370 U.S. 173, 181–82, 82 S.Ct. 1237, 1241–42, 8 L.Ed.2d 418 (1962); *NLRB v. Cabot Carbon Co.,* 360 U.S. 203, 211 & n. 7, 79 S.Ct. 1015, 1020–21 & n. 7, 3 L.Ed.2d 1175 (1959). Webcor nonetheless contends that the Council is not a labor organization because (1) it did not "deal with" the company concerning work conditions, and (2) members of the Council did not represent other employees. Respondent's Br. at 12.

▇▇▇ This Circuit has in recent years applied inconsistent standards in reviewing the Board's interpretation of the NLRA.[2] Just last year, however, the Supreme Court clearly stated its view that the courts must defer to the NLRB's interpretation of the Act under the two-step test of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2780–81, 81 L.Ed.2d 694 (1984). *Holly Farms Corp. v. NLRB,* —— U.S. ——, ——, 116 S.Ct. 1396, 1401, 1406, 134 L.Ed.2d 593

(1996) (applying *Chevron* to Board adjudication). *Accord International Longshoremen's and Warehousemen's Union, Local 14 v. NLRB,* 85 F.3d 646, 652 (D.C.Cir.1996) ("[P]ursuant to the precepts of *Chevron* ..., we must defer to the Board's reasonable judgments regarding applications of the NLRA."). *See generally* KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., 1 ADMINISTRATIVE LAW TREATISE § 3.5 at p. 120 (3d ed. 1994) ("Since Congress gave NLRB both the power to make policy decisions and the power to adjudicate, it is fair to infer that Congress delegated to NLRB the power to make binding policy decisions through the process of adjudication," and *Chevron* analysis is therefore appropriate.). "For the Board to prevail, it need not show that its construction is the best way to read the statute; rather, courts must respect the Board's judgment so long as its reading is a reasonable one." *Holly Farms,* —— U.S. at ——, 116 S.Ct. at 1406 (citations omitted). Thus, *Holly Farms* establishes the standard of review now binding on the courts of appeals in reviewing the NLRB's interpretation of the relevant provisions of the NLRA.[3] Under this standard, our first task is to determine "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781. If Congress has done so, we must give effect to its expression. *Id.* at 842–43, 104 S.Ct. at 2781–82. If not, however, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782. *Accord Holly Farms,* —— U.S. at ——, 116 S.Ct. at 1406.[4]

**2.** *Compare Evergreen Healthcare, Inc. v. NLRB,* 104 F.3d 867, 873 (6th Cir.1997) (stating that "the Board's conclusions of law ... are reviewed by this Court de novo," but noting that court should refuse enforcement if "order has no 'reasonable basis in law.'") (citing *NLRB v. Pentre Elec., Inc.,* 998 F.2d 363, 368 (6th Cir.1993)); *Cleveland Real Estate Partners v. NLRB,* 95 F.3d 457, 462, 465 (6th Cir.1996) (applying de novo review but asserting that court is "respectful of the Board's interpretation" of the law), *with Opportunity Homes, Inc. v. NLRB,* 101 F.3d 1515, 1518 (6th Cir.1996) (stating that de novo review applies) (citing *Pentre Elec.*); *NLRB v. Fluor Daniel, Inc.,* 102 F.3d 818, 826 (6th Cir.1996) (reviewing Board's legal conclusions de novo);

*Smiths Indus., Inc. v. NLRB,* 86 F.3d 76, 79 (6th Cir.1996) (same) (citing *Pentre Elec.*).

**3.** To the extent that our prior statements of the standard of review conflict with *Holly Farms,* the Supreme Court decision has effectively overruled them. We note that none of the prior opinions from our circuit cite *Holly Farms* or *Chevron* for the applicable standard of review.

**4.** If the Board had applied the statute inconsistently or had changed its construction of the statute without reasoned justification, *Chevron* deference would not be appropriate. *See Holly Farms,* —— U.S. at ——, 116 S.Ct. at 1404. That is not an issue in this case, as discussed below.

■ The Board has held that a group constitutes a labor organization if it involves "(1) employee participation, (2) a purpose to deal with employers, (3) concerning itself with conditions of employment or other statutory subjects, and (4) if an 'employee representation committee or plan' is involved, evidence that the committee is in some way representing the employees." *Electromation, Inc.,* 309 N.L.R.B. 990, 996, 1992 WL 386692 (1992), *enforced,* 35 F.3d 1148 (7th Cir.1994).[5] This construction of the term is an entirely reasonable refinement of the statutory definition quoted above, and we must therefore adopt it under *Chevron.* There is no question that the Council involved employees and addressed conditions of employment. *See* Respondent's Br. at 9; J.A. at 60, 118, 138. Webcor asserts, however, that the Plant Council did not represent other employees and that it did not "deal with" the company.

### 1. Whether the Plant Council Represented Other Employees

Webcor's first argument is that the Plant Council was not a labor organization because it did not represent other employees. Instead, the company argues, the Council merely provided a forum for employees to make suggestions, which the Council then communicated to management. As its opinion below notes, the Board has yet to decide "whether an employee group could be found to constitute a labor organization absent a finding that it acted as a representative of other employees." J.A. at 5 n. 6 (citing *Electromation,* 309 N.L.R.B. at 994 n. 20, which specifically reserved the issue). Because we affirm the ALJ's finding that the Council members did act as representatives, we need not address the novel legal question.

■ The ALJ's determination that the Plant Council members acted at least in part as representatives of other workers is one of fact, which we may not disturb so long as it is supported by substantial evidence. 29 U.S.C. § 160(e); *Taylor Warehouse Corp. v. NLRB,* 98 F.3d 892, 898 (6th Cir.1996). Even if this finding rests solely on an inference that the ALJ has drawn, it must stand unless that inference is unreasonable. *Id.* at 899.

■ The ALJ specifically noted that the Council was not meant to be a strictly representational body. J.A. at 18. However, he believed that the fact that the employee members were elected showed that they served at least in part as representatives: people vote for particular delegates because they hope that the person they elect will represent their views, either because the delegate shares them or because she will try to determine them. The Board gives further reasons to support this finding. First, that a proposed new attendance policy was circulated to all employees with instructions that they "respond back to the Plant Council," *see* J.A. at 16, 81, 90–92, supports the inference that the Council was meant to represent those employees who did respond. J.A. at 5

---

**5.** The decisions in *Electromation* and *E.I. du Pont de Nemours & Co.,* 311 N.L.R.B. 893 (1993), discussed *infra,* were intended as "landmark" cases that would clarify the Board's policy concerning the distinction between permissible "quality circles" and illegal company unions. *See* Robert B. Moberly, *The Worker Participation Conundrum: Does Prohibiting Employer-Assisted Labor Organizations Prevent Labor-Management Cooperation?,* 69 Wash. L.Rev. 331, 346–356 (1994) (discussing *Electromation* and *duPont*). Professor Moberly concludes that the Board has struck the correct balance by allowing worker participation programs (which he endorses) while prohibiting the establishment of employee groups that companies will use to undermine workers' rights. *Id.* at 359. In the last few years Congress has attempted to amend the NLRA so as to overrule *Electromation;* the bill narrowly passed through both houses but was vetoed by

the President. *See* Nancy K. Kubasek et al., *Putting Worker–Management Relations in Context: Why Employee Representational Choice Needs Greater Protection in Reform of Section 8(a)(2) of the NLRA,* 34 Harv. J. on Legis. 53, 53–55, 69 (1997) (discussing Teamwork for Managers and Employees Act (TEAM Act), which would have amended the NLRA so that "it [would] not constitute or be evidence of an unfair labor pratice under this paragraph for an employer to establish, assist, maintain, or participate in any organization ... in which employees [deal with employers about] matters of mutual interest" unless the organization purported to be the employees' bargaining agent or union) (quoting H.R. 743, 104th Cong. (1995)). A similar proposal is currently pending in Congress. *See* S. Rep. No. 105–12 (Teamwork for Employees and Managers Act of 1997).

n. 6. Furthermore, the minutes of some of the Council meetings suggest that the worker-members served to represent the whole class of employees. *See* J.A. at 69 (addressing "method of getting some response back from Plant Council to the employees"); J.A. at 75 (requesting management action on employee suggestion). Also, it appears from the record that, initially, suggestions to the Council were made in writing and then discussed without inviting the person who made the suggestion. J.A. at 79. Such a practice weakens the company's claim that the Council was only a forum for individual employees to air their ideas: when a group of workers and management sits down to discuss suggestions made by absent workers it is reasonable to infer that the worker-members are representing their coworkers. Finally, if the Council was meant to get input from lots of individual employee members, it is hard to see why members were elected for such long (one-year) terms. *Cf. NLRB v. Streamway Div. of Scott & Fetzer Co.*, 691 F.2d 288, 290, 294–95 (6th Cir.1982) (noting that "continuous rotation of Committee members" for three-month terms suggested that members acted as individuals rather than as representatives). In short, there is ample evidence supporting the ALJ's finding that the Council operated at least in part as a representative body, rather than a brainstorming group. *Cf. NLRB v. General Shoe Corp.*, 192 F.2d 504, 506, 507 (6th Cir.1951) (holding similar committee to be labor organization), *cert. denied*, 343 U.S. 904, 72 S.Ct. 635, 96 L.Ed. 1323 (1952).

## 2. Whether the Plant Council was Engaged in "Dealing with" Webcor

 The Supreme Court has long held that Congress intended the phrase "dealing with" to include a much broader range of employer-worker interaction than would fall within the traditional concept of collective bargaining. *Cabot Carbon*, 360 U.S. at 213–

214, 79 S.Ct. at 1021–22. More recently the Board has developed a fairly precise definition of the term, holding that "dealing with"

> ordinarily entails a pattern or practice in which a group of employees, over time, makes proposals to management, management responds to these proposals by acceptance or rejection by word or deed, and compromise is not required. If the evidence establishes such a pattern or practice, or that the group exists for a purpose of following such a pattern or practice, the element of dealing is present. However, if there are only isolated instances in which the group makes ad hoc proposals to management followed by a management response of acceptance or rejection by word or deed, the element of dealing is missing.
>
> . . .
>
> [I]f the committee exists for the purpose of sharing information with the employer, the committee would not ordinarily be a labor organization. That is, if the committee makes no proposals to the employer, and the employer simply gathers the information and does what it wishes with such information, the element of dealing is missing, and the committee would not be a labor organization.

*E.I. du Pont de Nemours & Co.*, 311 N.L.R.B. 893, 894, 1993 WL 191471 (1993). We do not believe—and Webcor does not claim—that this is an unreasonable definition of the rather vague term "dealing." And, under this standard the ALJ's findings make it plain that the Council was created to, and did, deal with the employer: the Council made several specific suggestions to the company and the company responded by voluntarily adopting at least four of these.[6] This is a paradigm case of dealing. In fact, the Council is in this respect indistinguishable from the committees held to violate the Act in *NLRB v. Newport News Shipbuilding & Dry Dock Co.*, 308 U.S. 241, 244–47, 251, 60

---

6. *See* J.A. at 15–16 (ALJ findings). These changes included a new policy whereby the company, rather than the individual workers, would purchase tools, J.A. at 234–36; a new policy equalizing eligibility for overtime, displacing the old seniority system, J.A. at 152, 163; a new policy whereby Webcor would annually purchase

an additional pair of safety boots for those who needed them, J.A. at 151–52; and, a modification to a management-proposed change in the attendance policy, J.A. at 158, 91–92. There was also testimony that the Council's action had led to a new policy regarding vacation pay. J.A. at 150–51, 215–16.

S.Ct. 203, 205–07, 208, 84 L.Ed. 219 (1939); *NLRB v. General Shoe Corp.*, 192 F.2d 504, 507 (6th Cir.1951); and *NLRB v. Sharples Chemicals, Inc.*, 209 F.2d 645, 651–52 (6th Cir.1954) (both cited with approval in *Cabot Carbon*, 360 U.S. at 212 n. 14, 79 S.Ct. at 1021 n. 14). Webcor nonetheless claims that our more recent case law indicates that the Council did not deal with the company.

Webcor first argues that the Council cannot be a labor organization under this court's holding in *Scott & Fetzer*, 691 F.2d at 295. We disagree. The *Scott & Fetzer* court's conclusion that the committee before it was not a labor organization rested on the lack of a "continuous interaction between employer and committee." *Id.* at 294. *See id.* ("Although *Cabot Carbon* cautions against a restrictive reading of the term 'dealing,' it involved a more active, ongoing association between management and employees, which the term dealing connotes, than is present here."). The court noted that there was only one instance in which the employer changed a policy at the committee's request. *Id.* at 295 n. 11. ("An isolated incident does not convert the Committee into a labor organization."). This holding is, for the purposes of the matter at hand,[7] consistent with the Board's current definition of dealing, which excludes such "isolated instances in which the group makes ad hoc proposals to management followed by a management response." *du Pont*, 311 N.L.R.B. at 894. In the case at bar, the ALJ found that the company had made at least four significant policy changes as a result of the Council's recommendations. *See* note 6, above. This constitutes an active, ongoing course of dealings, and *Scott & Fetzer* is in this respect inapposite.

Webcor next cites *Scott & Fetzer* and *Airstream, Inc. v. NLRB*, 877 F.2d 1291 (6th Cir.1989), for the proposition that because there is no evidence that the company formed the Plant Council out of hostility towards the union or in order to deceive employees or otherwise obstruct the unionization drive, the Council was not a labor organization. While we acknowledge that some of the language in these two cases suggests that the existence of employer bad faith is relevant in determining whether a particular group constitutes a labor organization under the Act, longstanding precedents from this circuit, the Supreme Court, and the NLRB, as well as the text of the statute itself, make it clear that bad faith is not a prerequisite to a finding that a company-sponsored group is a labor organization.

■ The statutory definition of "labor organization" makes no reference to employer bad faith or anti-union animus. Moreover, in *Newport News* the Court held that a finding that the employer had not interfered with union elections and that the employees were satisfied with a company-sponsored Employees' Representative Committee did not preclude the Board from finding the committee to constitute an illegal company-dominated labor organization. 308 U.S. at 248, 251, 60 S.Ct. at 207, 208. The Board continues to adhere to this holding. *See Electromation*, 309 N.L.R.B. at 995 n. 24 (no need to prove anti-union motive or intent to interfere with right to unionize). This court, too, has upheld Board determinations that similar employee committees were labor organizations, without any showing of employer bad faith. *See, e.g., General Shoe*, 192 F.2d at 507; *Sharples Chemicals*, 209 F.2d at 651–52. We can, in fact, find no meaningful distinction between Webcor's Plant Council and the employee groups found to be labor organizations in each of these cases. *See Cabot Carbon*, 360 U.S. at 213–14, 79 S.Ct. at 1021–22; *Newport News*, 308 U.S. at 244–47, 60 S.Ct. at 205–07; *Electromation*, 35 F.3d at 1161; *Sharples Chemicals*, 209 F.2d at 648–49; *General Shoe*, 192 F.2d at 505–06. The alleged labor organization in *Airstream*, on the other hand, was no more than a continuation of an earlier program involving employer-worker "rap sessions," which the Board had specifically found existed solely to facilitate communication and therefore not to constitute a labor organization. *See* 877 F.2d at

---

**7.** The Board's definition does, however, indicate that, contrary to *Scott & Fetzer's* holding, a "recital of the committee's purpose" to deal could itself be sufficient evidence of dealings. *See du-* *Pont*, 311 N.L.R.B. at 894 ("If the evidence establishes ... that the group exists for a purpose of following such a pattern or practice, the element of dealing is present.").

1295. The *Airstream* court in fact distinguished this employee group from similar groups that we had found to constitute labor organizations on just this basis. *Id.* at 1297. Webcor's Plant Council is not merely a continuation of any legal employee-employer rap session program. In light of the holdings in *Cabot Carbon, Newport News, General Shoe,* and *Sharples Chemicals,* and of the deference that we must give the Board's determination as to what factors define the term labor organization as used in the NLRA, we conclude that this distinguishes the group at issue in *Airstream* from the Plant Council and the organizations in the cited cases, and that the Plant Council, like those other groups, constitutes a labor organization under section 29 U.S.C. § 152(5).[8]

## B. Whether Webcor Dominated the Plant Council

 Webcor next argues that, even if the Plant Council was a labor organization, Webcor did not dominate it. The Board has defined domination for the purposes of the statute:

[A] labor organization that is the creation of management, whose structure and function are essentially determined by

management, ... and whose continued existence depends on the fiat of management, is one whose formation or administration has been dominated under Section 8(a)(2). In such an instance, *actual* domination has been established by virtue of the employer's specific acts of creating the organization itself and determining its structure and function. However, when the formulation and structure of the organization is determined by employees, domination is not established, even if the employer has the potential ability to influence the structure or effectiveness of the organization. Thus, the Board's cases following *Cabot Carbon* reflect the view that when the impetus behind the formation of an organization of employees emanates from an employer and the organization has no effective existence independent of the employer's active involvement, a finding of domination is appropriate if the purpose of the organization is to deal with the employer concerning conditions of employment.

*Electromation,* 309 N.L.R.B. at 995–96 (footnote and citations omitted). The term "dominate," as used in the Act, is not self-defining, and the Board's definition is not

8. Even if we found *Airstream* indistinguishable from the case at bar we would be hesitant to reverse the Board's holding that the Plant Council is a labor organization as defined by the Act. As noted above, the Supreme Court has recently repeated its holding that we must accept the Board's reasonable construction of ambiguous terms in the NLRA under *Chevron. Airstream* and *Scott & Fetzer* gave no deference to the Board's reading of the Act: instead, they set out to provide what they considered to be an "enlightened view of the Act." *Scott & Fetzer,* 691 F.2d at 291. *See Airstream,* 877 F.2d at 1296 ("An overly broad construction of the statute would be as destructive of the objects of the Act as ignoring the provisions entirely.") (quoting *Scott & Fetzer,* 691 F.2d at 292). As discussed above, such policy questions are for the Board, not for the courts. *Airstream* and *Scott & Fetzer* therefore addressed a question—the best construction of the NLRA—which is not before us; the question before us is only whether the Board's reading of the Act is reasonable. *See Holly Farms,* —— U.S. at ——, 116 S.Ct. at 1406 ("For the Board to prevail, it need not show that its construction is the best way to read the statute...."). And, as discussed in the text, because the Board's reading is consistent with a long line of holdings out of both the Supreme Court and

this court, we believe it is quite reasonable. *Cf. Reich v. D.M. Sabia Co.,* 90 F.3d 854, 860 (3d Cir.1996) (overruling prior panel's holding in part based on *Chevron* ); *Mesa Verde Constr. Co. v. Northern Cal. Dist. Council of Laborers,* 861 F.2d 1124, 1136 (9th Cir.1988) (en banc) (holding that "if a panel finds that a NLRB interpretation of the labor laws is reasonable and consistent with those laws, the panel may adopt that interpretation even if circuit precedent is to the contrary" despite Circuit rule that one panel may not overrule another.). We note that the Board's opinion distinguished *Airstream* and *Scott & Fetzer* from the case at bar, rather than taking a "nonacquiescence" approach and simply ignoring our precedent. This is also not an instance in which the Board has departed from the Supreme Court's interpretation of the statute. *Cf. Maislin Inds., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 130–31, 110 S.Ct. 2759, 2768–69, 111 L.Ed.2d 94 (1990) (refusing to follow agency's new interpretation of statute which conflicts with century-old Supreme Court precedent). If Congress disagrees with the Supreme Court's interpretation of a statute it can be expected to amend the law. *See id.* at 131, 110 S.Ct. at 2768–69. Congress cannot, however, be expected continuously to revise statutes to address isolated lower court dicta with which it disagrees.

unreasonable. *See Newport News,* 308 U.S. at 249, 60 S.Ct. at 207–08 (upholding finding of domination where company determined structure of organization and could choose whether to adopt recommendations); *Electromation,* 35 F.3d at 1163 ("The Board's interpretation of Section 8(a)(2) simply does not contravene the statutory language."); *Scott & Fetzer,* 691 F.2d at 291 (assuming domination where committee "was expressly mandated by the Company, and the Company controlled its composition and its meetings"); *Sharples Chemicals,* 209 F.2d at 652 (domination finding supported by evidence of employer financial support, management participation in committee and power to remove representatives by transferring them to different department). As the ALJ noted, the Plant Council here was created by management and could have been disbanded by management. *See* J.A. at 19. Furthermore, that it lacked independent means of support, met on company property during working hours, never met independent of management, and had its elections run by the company all support the finding of domination. J.A. at 19. *See NLRB v. H & H Plastics Mfg. Co.,* 389 F.2d 678, 680 (6th Cir.1968). *See also Electromation,* 35 F.3d at 1170 (upholding finding of domination in similar situation); *NLRB v. Chardon Tel. Co.,* 323 F.2d 563, 564 (6th Cir.1963) (per curiam) ("Employees are free to form their own independent organization, but the [NLRA] requires that any such organization shall be completely independent of the employer.") (citation omitted).

■ *Modern Plastics Corp. v. NLRB,* 379 F.2d 201 (6th Cir.1967), is not to the contrary. In *Modern Plastics* we distinguished between employer cooperation with, and domination of, a labor organization and concluded that the relationship in that case was one of cooperation. *Id.* at 204. Importantly, the evidence in that case was "limited to actions which occurred after the formation of the Committee," *id.* at 203, whereas much of the evidence of domination in the case at bar relates to the company's role in creating the Council. Where, as in *Modern Plastics,* there is no evidence that the employer played an inappropriate role in the actual formation of the labor organization, a showing that the employer is actually exerting influence over the organization is needed to find domination. *Electromation,* 309 N.L.R.B. at 995–96 (quoted above). If the company itself creates the labor organization, however, such a showing of actual control is unnecessary.[9] *Id. See General Shoe,* 192 F.2d at 505, 507. The Board's determination that Webcor dominated the Plant Council is supported by substantial evidence.

## C. The Scope of the Board's Remedy

■ Webcor's final argument is that, even if the Council violated the Act and the Board was correct in ordering its disestablishment, the Board erred in ordering that the union election results be set aside and new elections held. An order setting aside elections is not ripe for our review until subsequent elections are held, even when that order is consolidated with other questions that are immediately appealable. *United States Elec. Motors v. NLRB,* 722 F.2d

---

**9.** William Gould, the current Chairman of the NLRB, has called for Congress to amend the NLRA to clarify the definition of "dominate" so as to make clear that employers may promote the formation of and cooperate with employee groups so long as the employees retain control over the organizations. *See, e.g.,* William B. Gould IV, *Employee Participation and Labor Policy: Why the TEAM Act Should be Defeated and the National Labor Relations Act Amended,* 30 Creighton L.Rev. 3, 11 (1996) ("Employers ought to be able to promote the creation of and to subsidize employee groups.... [T]he final and most important aspect of any change should be an assurance that such employee organizations will be autonomous, that is to say, that they can select their own representatives or leadership and determine what it is that they want to discuss with management and how their organization should be structured.... [T]he employer that promotes such an employee group must be prepared to allow for genuine employee participation in leadership as well as involvement on employment issues.") Chairman Gould concurred in the Board's judgment below on the grounds that "the control exercised by the Respondent over the Plant Council is such that the freedom of choice and independence of action open to employees is too strictly confined within parameters of the Respondent's making for the Plant Council to be a genuine expression of democracy in the workplace." J.A. at 6–7 n. 13 (citing *Keeler Brass Automotive Group,* 317 N.L.R.B. 1110, 1995 WL 421143 (1995) (Gould, Chairman, concurring)).

315, 320 (6th Cir.1983) (per curiam), *cert. denied,* 467 U.S. 1216, 104 S.Ct. 2659, 81 L.Ed.2d 365 (1984). *Accord NLRB v. Pizza Crust Co. of Penn., Inc.,* 862 F.2d 49, 50 (3d Cir.1988) (collecting cases); *American Bread Co. v. NLRB,* 411 F.2d 147, 156 (6th Cir. 1969). The proper route for review is for the employer to refuse to recognize a subsequent, Board-ordered election on the grounds that the election was improper. *Electrical Motors,* 722 F.2d at 320. Accordingly, we have no jurisdiction over this part of the appeal and cannot address the merits of the issue. *Id.*

## III. CONCLUSION

For the reasons discussed above, we ENFORCE the Board's order disestablishing the Plant Council and hold that we are without jurisdiction over that portion of the order that requires new elections to be held.

RALPH B. GUY, Jr., Circuit Judge, concurring in the result only.

Because I believe that the result reached in this case no longer reflects congressional intent, it is with the greatest of reluctance that I concur. But for a presidential veto of amendatory legislation passed by Congress, what Webcor attempted to do here would be viewed against the backdrop of legislation more hospitable to concepts like plant councils.

In a similar vein, gratuitous on my part though it may be, I believe that the Board exceeded its authority when it ordered a new election. There is nothing in the record to indicate that the rejection of the union in the first election represented other than the clear will of a majority of the employees. The Plant Council at issue here was not even formed until after the election.

I realize, of course, that this issue is not now before us, and so I agree that we must enforce the Board's order.